No. 26-3426

IN THE

# United States Court of Appeals for the Sixth Circuit

**UNITED STATES OF AMERICA**

Plaintiff-Appellee

v.

**LAWRENCE STURDIVANT**

Defendant-Appellant

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

## APPELLANT'S OPENING BRIEF


Paul M. Flannery
**FLANNERY | GEORGALIS LLC**
1621 Euclid Avenue
16th Floor
Cleveland, Ohio 44115
(216) 702-4463
paul@flannerygeorgalis.com

W. Benjamin Reese
**FLANNERY | GEORGALIS LLC**
175 South Third Street
Suite 285
Columbus, Ohio 43215
(216) 200-8530
breese@flannerygeorgalis.com

*Counsel for Defendant Lawrence Sturdivant*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........ **iii**

**STATEMENT IN SUPPORT OF ORAL ARGUMENT** ........ **ix**

**ISSUE PRESENTED** ........ **1**

**STATEMENT OF JURISDICTION** ........ **2**

**INTRODUCTION** ........ **3**

**STATEMENT OF THE CASE** ........ **5**

**A. Cleveland-area law enforcement agencies have created an expansive, dragnet-style system of ALPR surveillance** ........ **5**

1. A web of Flock Safety cameras covers the Cleveland area ........ 5
2. A parallel ELSAG system blankets the same area ........ 10
3. These systems provide a broad and wide-ranging view of citizens' movements ........ 11

**B. A series of robberies leaves law enforcement stumped** ........ **14**

**C. Warrantless ALPR searches lead police to Mr. Sturdivant** ........ **16**

**D. Mr. Sturdivant is charged and unsuccessfully moves to suppress the evidence against him** ........ **19**

**SUMMARY OF THE ARGUMENT** ........ **20**

**ARGUMENT** ........ **23**

**A. ALPR queries invade citizens' reasonable expectations of privacy and are a search under the Fourth Amendment** ........ **23**

1. ALPR data, like cell-phone location data, provides an intimate window into a person's life ........ 25

2. ALPR surveillance is automatic, indiscriminate, inescapable, inexpensive, and retrospective ........ 34

3. Warrantless ALPR surveillance is inconsistent with the original understanding of the Fourth Amendment ........ 38

4. ALPR surveillance poses a greater risk to liberty and privacy than cell-phone location data ........ 42

**B. Officers would not have inevitably connected Mr. Sturdivant's car to the robberies ........ 47**

**C. The good-faith exception cannot save the officers here ........ 51**

**CONCLUSION ........ 54**

**CERTIFICATE OF COMPLIANCE ........ 56**

**CERTIFICATE OF SERVICE ........ 57**

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ........ 58**

## TABLE OF AUTHORITIES

**Cases**

*Arizona v. Evans*, 514 U.S. 1 (1995)............53

*Boyd v. United States*, 116 U.S. 616 (1886)............24, 39

*Carroll v. United States*, 267 U.S. 132 (1925)............24, 38

*Chatrie v. United States*, 609 U.S. 605 (2026)............*passim*

*Commonwealth v. McCarthy*, 142 N.E.3d 1090 (Mass. 2020)............54

*Davis v. United States*, 564 U.S. 229 (2011)............52, 53

*Illinois v. Krull*, 480 U.S. 340 (1987)............53

*United States v. Jones*, 565 U.S. 400 (2012)............*passim*

*Klayman v. Obama*, 957 F.Supp.2d 1 (D.D.C. 2013)............38

*Kyllo v. United States*, 533 U.S. 27 (2001)............24

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330 (4th Cir. 2021)............26, 28, 42, 43

*Mockeridge v. Harvey*, 149 F.4th 826 (6th Cir. 2025)............23

*Morrison v. Olson*, 487 U.S. 654 (1988)............45

*New York v. Class*, 475 U.S. 106 (1986)............30

*Nix v. Williams*, 467 U.S. 431 (1984)............47

*Northrop v. Trippett*, 265 F.3d 372 (6th Cir. 2001)............51

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922)............32

*Riley v. California*, 573 U.S. 373 (2014)............34, 36

*United States v. Burston*, 806 F.3d 1123 (8th Cir. 2015)............52

*United States v. Carpenter*, 585 U.S. 296 (2018) .................................... *passim*

*United States v. Cooper*, 24 F.4th 1086 (6th Cir. 2022) .............. 47, 48, 49, 50

*United States v. Di Re*, 332 U.S. 581 (1948) ........................................... 24, 37

*United States v. Ellison*, 462 F.3d 557 (6th Cir. 2006) .................................30

*United States v. Fellmy*, 165 F.4th 501 (6th Cir. 2026) .................................23

*United States v. Ford*, 184 F.3d 566 (6th Cir. 1999) .....................................47

*United States v. Jenkins*, 850 F.3d 912 (7th Cir. 2017) .................................52

*United States v. Kyle*, No. 26-cr-189, 2026 WL 2958728 (N.D. Okla. Oct. 1, 2026) ..............................................................................................46

*United States v. Lara*, 815 F.3d 605 (9th Cir. 2016) .....................................52

*United States v. Lazar*, 604 F.3d 230 (6th Cir. 2010) ..................................47

*United States v. Lee*, 862 F. Supp. 2d 560 (E.D. Ky. 2012) ..........................52

*United States v. Leon*, 468 U.S. 897 (1984) ..................................................53

*United States v. Matthews*, 615 F.2d 1279 (10th Cir. 1980) ..........................36

*United States v. Miranda-Sotolongo*, 827 F.3d 663 (7th Cir. 2016) ................36

*United States v. Ortiz*, 878 F. Supp. 2d 515 (E.D. Pa. 2012) .........................52

*United States v. Porter*, 170 F.4th 381 (5th Cir. 2026) ..................... viii, 27, 30

*United States v. Rogers*, 97 F.4th 1038 (6th Cir. 2024) .................................23

*United States v. U.S. District Court*, 407 U.S. 297 (1972) .......... 43, 44, 45, 46

*United States v. Waide*, 60 F.4th 327 (6th Cir. 2023) ...................................23

**Statutes**

18 U.S.C. § 3231 ............................................................................... 2

28 U.S.C. § 1291 .......... 2

**Other Authorities**

*Always Watching: Flock's Nationwide AI Surveillance Network: Hearing Before Subcomm. On Crime and Counterterrorism of the S. Committee on the Judiciary*, 119 Cong. (2026) (statement of S. Josh Hawley, Chairman), available at https://www.judiciary.senate.gov/committee-activity/hearings/always-watching-flocks-nationwide-ai-surveillance-network .......... 6, 7

Bhuiyan, Johana, *How expanding web of license plate readers could be 'weaponized' against abortion*, The Guardian (Oct. 6, 2022, 6:00 EDT), *available at* https://perma.cc/T2UX-BE5E .......... 8

Cox, Joseph, *Flock Pitched a Plan to Turn Uber and Lyft Drivers into Roaming Surveillance Vehicles*, 404 Media (Aug. 7, 2026), *available at* https://perma.cc/AW5F-GK25 .......... 8

Davies, Thomas Y., *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 622-23 n.198 (1999), *available at* https://perma.cc/VET8-AQXA .......... 40

*DeFlock Maps*, DeFlock.com, available at: maps.deflock.org, *last accessed* Oct. 21, 2026 .......... 12

Farivar, Cyrus, *Habeas Data: Privacy v. the Rise of Surveillance Tech* 87 (2018) .......... 12, 26

Flock Safety, *Flock Safety Announces the Wing Integration to Distill 1000s of Hours of IP Camera Footage into Searchable Images that Solve Crime*, Globe Newswire (Oct. 20, 2020), *available at* https://perma.cc/LC8U-WVAP . 9

Flock Safety, *Frequently Asked Questions—Privacy and Access*, https://perma.cc/VHH4-SNSG (archived June 9, 2025) .......... 10

Forbes Advisor, *Car Ownership Statistics 2024*, updated March 28, 2024, *available at* https://www.forbes.com/advisor/car-insurance/car-ownership-statistics/ .......... 35

Gallek, Ed, Fox 8, *Where cars are most likely to be stolen in Cleveland: I-Team*, (updated Mar. 1, 2023, 6:01 a.m. EST), available at https://fox8.com/news/where-cars-are-most-likely-to-be-stolen-in-cleveland-i-team/ (last visited Dec. 18, 2024) .......................................50

Hamid, Sarah, *EFF's Investigations Expose Flock Safety's Surveillance Abuses: 2025 in Review*, Electronic Frontier Foundation (Dec. 30, 2025), available at https://perma.cc/6DH9-T6EW ....................................................... 44

Hill, Kashmir, *Your Face Belongs to Us* (2023) ............................................. 13

Illangakoon, Chathura, R. D. McLeod, Marcia Friesen, *Agent Based Modeling of Malaria*, 2014 IEEE Canada International Humanitarian Technology Conference, at 6 (July 2015), *available at* https://ieeexplore.ieee.org/stamp/stamp.jsp?tp=&arnumber=7147546 (last visited Oct. 30, 2026) .....................................................................29

International Assoc. of Chiefs of Police, *Privacy Impact Assessment Report for the Utilization of License Plate Readers* 1 (Sept. 2009), *available at* https://perma.cc/Q4J3-467K..................................................................5

Koebler, Jason, *Flock Taught Cops How to Surveil No Kings Protesters*, 404 Meida (Sept. 3, 2026), *available at* https://perma.cc/3HLS-AP9D ......... 13

Koebler, Jason, *Home Depot and Lowe's Share Data from Hundreds of AI Cameras with Cops*, 404 Media (Aug. 6, 2025), *available at* https://perma.cc/V6E2-TD62 ............................................................... 8

Koebler, Jason, *Surveillance Company Tells Cops It Wants to Add Facial Recognition to Flock Cameras*, 404 Media (Sept. 29, 2026), *available at* https://perma.cc/CTU5-NEC7 .............................................................14

Lartey, James, *The Troubling Personal Side of Public Surveillance*, The Marshall Project (March 7, 2026), *available at* https://www.themarshallproject.org/2026/03/07/police-camera-wisconsin-california-colorado ................................................................ 44

Laura K. Donahue, *The Original Fourth Amendment*, 83 U. Chi. L. Rev. 1181, 1233–35 (2016), *available at* https://perma.cc/9GRE-8JMB.................. 40

Lawrence, Isabel, *Technology helps Cleveland police crack down on crime at Real Time Crime Center*, WKYC (May 23, 2023, updated 7:10 PM EDT), *available at* https://www.wkyc.com/article/news/local/cleveland/cleveland-police-utilize-technology-real-time-crime-center/95-265827ce-4fbb-4af8-b249-ef0327ddd021 (last visited Oct. 29, 2026) ............................................12

Maclin, Tracey, *Informants and the Fourth Amendment: A Reconsideration*, 74 Wash. U. L.Q. 573, 582–83 (1996), *available at* https://perma.cc/XU2T-QS5F .............................................................................................. 40

Matthew Urwin, *Flock Cameras Are Everywhere. Here's What They Actually Do*, BuiltIn (Oct. 6, 2026), *available at* https://perma.cc/76NA-ERUC ...5, 6, 7, 8, 9, 45

Mehrotra, Dhruv & Joseph Cox, *Hackers Got Inside a Flock Camera. Its Data Shows How the System Really Works*, Wired (Sept. 16, 2026), *available at* https://perma.cc/4QVW-ZLGB .........................................................6, 9

National Association of Criminal Defense Lawyers (NACDL) Primer, *Cell Phone Location Tracking*, *available at* https://perma.cc/VJ2A-VCDM.....29

Noah Webster, *An American Dictionary of the English Language* 66 (1828), *available at* https://perma.cc/VJB5-XFBU............................................39

Parker, James, *Conductor Generalis: or, the Office, Duty and Authority of Justices of the Peace* 461 (1764), *available at* https://bit.ly/4bEcyYR........ 40

Pew Research Center Mobile Fact Sheet, published October 19, 2026, *available at* https://perma.cc/M5VY-2YC4 ...........................................35

Pinckard, Cliff, Cleveland.com, *Car thefts take dramatic jump in Cleveland in 2023: The Wake Up from Monday, Aug 14, 2023*, available at https://www.cleveland.com/metro/2023/08/car-thefts-take-dramatic-jump-in-cleveland-in-2023-the-wake-up-for-monday-aug-14-2023.html (updated Aug. 14, 2023, 6:13 a.m.)........................................................50

Roberts, David J. and Meghann Casanova, *Automated License Plate Recognition Systems: Policy and Operational Guidance for Law Enforcement*,

Int'l Assn of Chiefs of Police 13 (Sept. 2012), *available at https://perma.cc/DD22-78K2*..........3

Rubenfeld, Jed, *The End of Privacy*, 61 Stan. L. Rev. 101, 131 (2008), *available at* https://perma.cc/D9JJ-X6YH..........41

Samuel Johnson, *Dictionary of the English Language* (4th ed. 1773), *available at* https://perma.cc/J4L4-LQQ8..........39

Silberling, Amanda, *Amazon's Ring Cancels Partnership with Flock, a Network of AI Cameras Used by ICE, Feds, and Police*, TechCrunch (Feb. 13, 2026), *available at* https://perma.cc/9C4R-54AT..........8

Silberling, Amanda, *Amazon's Ring to Partner with Flock, a Network of AI Cameras Used by ICE, Feds, and Police*, TechCrunch (Oct. 16, 2025), *available at* https://perma.cc/D2MS-TMLV..........8

Stanley, Jay, *Fast-Growing Company Flock is Building a New AI-Driven Mass Surveillance System*, ACLU 2 (March 2, 2022), *available at* https://perma.cc/W349-PSUL..........9

University of Wa. Ctr. For Human Rights, *Leaving the Door Wide Open: Flock Surveillance Systems Expose WA Data to Immigration Enforcement* 7 (Oct. 2025), *available at* https://perma.cc/K35R-Q6H9..........6

Wrench, John, *The Original Meaning of 'Searches,'* 29 Pa. J. Const. L. ___ (forthcoming 2027), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6303338..........39

**Constitutional Provisions**

U.S. Const. amend. IV.......... *passim*

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Defendant Lawrence Sturdivant requests oral argument because this case involves a novel and important constitutional question.

Law enforcement connected Mr. Sturdivant to several robberies using at least two Automated License Plate Reader ("ALPR") systems. These systems consist of more than two thousand cameras throughout the greater Cleveland area (and thousands more across the country), allowing law enforcement to track a vehicle across the city and beyond.

This Court has not weighed in on the Fourth Amendment's application to ALPR camera systems. But courts in other Circuits have disagreed about whether the use of ALPR systems is a search and thus requires a warrant. And the Supreme Court's recent decision in *Chatrie v. United States*, 609 U.S. 605 (2026), casts into doubt earlier decisions that found a warrant was not required for ALPR queries, including the Fifth Circuit's decision in *United States v. Porter*, 170 F.4th 381 (5th Cir. 2026).

This case thus not only presents a novel question of law in the Circuit, as the District Court recognized below, but raises the specter of a Circuit split. Mr. Sturdivant submits that, for these reasons, oral argument would help the panel decide this case.

## ISSUE PRESENTED

The Fourth Amendment protects citizens' reasonable expectations of privacy in the whole of their physical movements—including data revealing their historical location—against encroachments from new technologies and surveillance techniques. *Chatrie*, 609 U.S. at 621; *United States v. Carpenter*, 585 U.S. 296, 310 (2018). Here, law enforcement used two ALPR systems to reconstruct Mr. Sturdivant's movements over the course of a month, intertwining ALPR search results with other surveillance systems to do so. The question presented is whether their failure to obtain a warrant before running those ALPR queries violated the Fourth Amendment.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231, which confers jurisdiction over federal criminal cases.

Mr. Sturdivant timely filed a notice of appeal on May 11, 2026. (Notice of Appeal, R. 142, Page ID # 2858.)

He appeals from the district court's order denying his motion to suppress, issued on June 9, 2025 (Opinion & Order, R. 103, Page ID # 1941–68), and its judgment, issued on May 6, 2026 (Judgment, R. 139, Page ID # 2805–13).

This Court thus has jurisdiction under 28 U.S.C. § 1291, which confers jurisdiction over appeals from final orders of the district court.

## INTRODUCTION

Every day, millions of Americans drive to work, school, medical appointments, religious services, restaurants, the homes of friends and family, and more. Most would be surprised to learn that every time they travel the public roads to these places, their location data is being meticulously monitored and tracked for the government to analyze in real time or retroactively. Most would be even more surprised to learn that government agents can access that data whenever they want, for whatever reason, and without a warrant.

Yet that is the current state of play: ALPR systems combine cameras with analytic image software to collect the plate numbers, images, date, time, and location of every vehicle passing by a camera. David J. Roberts and Meghann Casanova, *Automated License Plate Recognition Systems: Policy and Operational Guidance for Law Enforcement*, Int'l Assn of Chiefs of Police 13 (Sept. 2012), *available at https://perma.cc/DD22-78K2*. The collection of this ALPR data is indiscriminate by design and captures images of every passing vehicle, regardless of whether the government has any basis for suspecting a vehicle's driver committed an offence. *See id.* The data is then compiled and combined with other surveillance systems—like security cameras, gunshot detection systems and more—to show a detailed and comprehensive view of a person's comings and goings—either in real time or retrospectively.

In other words, every day and in an increasing number of ways, law enforcement collects troves of data memorializing the precise travels of virtually anyone who travels on public roads. All without judicial oversight and (so far) little guidance from the appellate courts as to whether the Constitution allows such ubiquitous tracking. The government can then use that information, without a warrant or even a reasonable suspicion, to reconstruct a citizen's movement over an extended period.

That is exactly what happened to Mr. Sturdivant in this case. Using two ALPR systems (in coordination with other surveillance technologies), the government—from a grainy surveillance image of a black car with an unreadable and unidentifiable temporary tag and black and white bumper sticker—retrospectively identified Mr. Sturdivant and built a 131-Page dossier of his movements over the course of a month. They did so by conducting an unprecedented search of thousands—if not hundreds of thousands—of ALPR location and travel records without a warrant or, indeed, any judicial supervision at all. The government even went so far as to identify and interview Mr. Sturdivant's girlfriend based on its comprehensive surveillance of his comings and goings.

This pervasive warrantless surveillance, collection, and search of his travels violated the Fourth Amendment. As a result, all evidence obtained from law enforcement's utilization of this unprecedented tracking system in

this case, including the fruits of the ALPR evidence, should have been suppressed. And the District Court erred in concluding otherwise.

## STATEMENT OF THE CASE

### A. Cleveland-area law enforcement agencies have created an expansive, dragnet-style system of ALPR surveillance.

ALPR systems "consist of high-speed cameras combined with sophisticated computer algorithms capable of converting" images of license plates and vehicles "into computer-readable data." International Assoc. of Chiefs of Police, *Privacy Impact Assessment Report for the Utilization of License Plate Readers* 1 (Sept. 2009), *available at* https://perma.cc/Q4J3-467K. Officers used two such systems to identify Mr. Sturdivant here: One provided by Flock Safety, another by Selex ES.

#### 1. A web of Flock Safety cameras covers the Cleveland area.

Most local police departments in Cuyahoga County, Ohio have contracts with Flock, which leases access to its cameras to law enforcement and private agencies. (Flock Safety Camera List, R. 92-1, Page ID #: 2450–2611.) These cameras "record a vehicle's color, make and model, as well as the time and location of its sighting." Matthew Urwin, *Flock Cameras Are Everywhere. Here's What They Actually Do*, BuiltIn (Oct. 6, 2026), *available at* https://perma.cc/76NA-ERUC. Flock also makes use of sophisticated AI tools: "Flock pre-trains machine learning models on license plates from all 50 U.S. states, incorporating plates with undersized and stacked letters for

variety. Together, the sensors and models can track vehicles and discern their traits, creating a vehicle 'fingerprint.'" *Id.*

Indeed, even calling Flock's camera's "license plate readers" is misleading, because these systems detect much more than just license plate numbers. Recovered data from a Flock camera shows that the device's software "explicitly detects people as well as vehicles, license plates, and bicycles" as they pass the camera or (in the case of vehicle mounted ALPRs) when the camera passes them. Dhruv Mehrotra & Joseph Cox, *Hackers Got Inside a Flock Camera. Its Data Shows How the System Really Works*, Wired (Sept. 16, 2026), *available at* https://perma.cc/4QVW-ZLGB. Flock's "searchable features include details like dents and roof cracks and vehicle damage and racks on the roof or racks on the back or specific bumper stickers even." *Always Watching: Flock's Nationwide AI Surveillance Network: Hearing Before Subcomm. On Crime and Counterterrorism of the S. Committee on the Judiciary*, 119 Cong. (2026) (statement of S. Josh Hawley, Chairman), available at https://www.judiciary.senate.gov/committee-activity/hearings/always-watching-flocks-nationwide-ai-surveillance-network; University of Wa. Ctr. For Human Rights, *Leaving the Door Wide Open: Flock Surveillance Systems Expose WA Data to Immigration Enforcement* 7 (Oct. 2025), *available at* https://perma.cc/K35R-Q6H9. Flock's system thus identifies and can track the movements of cars based on far more than just their license-plate number—or, as Senator Josh Hawley put it in a recent hearing: "Flock can tell

if a car has a Trump sticker or a Harris sticker or a Pro-Life America sticker or an NRA sticker." Senate Flock Hearing, *supra* (statement of S. Josh Hawley, Chairman).

Flock's cameras "are even more powerful when paired with the company's platforms. For instance, Flock FreeForm lets users enter natural-language searches to scan networks" of its ALPRs and other surveillance systems—such as CCTV cameras, security cameras, gunshot detection systems, and more—"for vehicles and persons of interest." Urwin, *supra*. Officers are thus able to search using generic descriptions like "red truck with a blue bumper sticker on the back right bumper;" there is no need for them to know the plate number of the vehicle they are looking for or even its specific make or model.

As the district court found, there are 1,636 Flock cameras operating just in Cuyahoga County—667 of which are associated with law enforcement agencies. (Opinion & Order, R. 103, Page ID # 1946.) Another 225 law-enforcement-leased Flock cameras are active in adjacent counties. (*See* Flock Safety Camera List, R. 92-1, Page ID # 2450–2611.) But there are likely far more cameras available to law enforcement than publicly-available data shows. Private actors, including major retailers like Lowes and Home Depot, have also installed Flock cameras and many share them with law enforcement. *See, e.g.*, Jason Koebler, *Home Depot and Lowe's Share Data from Hundreds of AI Cameras with Cops*, 404 Media (Aug. 6, 2025), *available at*

https://perma.cc/V6E2-TD62. Flock has also pitched even wider applications: For example, Flock pitched a plan to Nexar, a popular dashcam company, that would have turned hundreds of thousands of Uber, Lyft, and delivery drivers into mobile ALPR cameras. Joseph Cox, *Flock Pitched a Plan to Turn Uber and Lyft Drivers into Roaming Surveillance Vehicles*, 404 Media (Aug. 7, 2026), *available at* https://perma.cc/AW5F-GK25. And the company briefly had a partnership agreement with Amazon that would have given Flock access to millions of Ring doorbell camera users—though Amazon backed out of that deal due to public backlash. Amanda Silberling, *Amazon's Ring to Partner with Flock, a Network of AI Cameras Used by ICE, Feds, and Police*, TechCrunch (Oct. 16, 2025), *available at* https://perma.cc/D2MS-TMLV; Amanda Silberling, *Amazon's Ring Cancels Partnership with Flock, a Network of AI Cameras Used by ICE, Feds, and Police*, TechCrunch (Feb. 13, 2026), *available at* https://perma.cc/9C4R-54AT.

Flock customers can also "tap the networks of others who opt in to data sharing as well, casting an even wider" and often nationwide "search that can rapidly generate leads and narrow down investigations." Urwin, *supra*. Indeed, the company boasts that its cameras are in "more than 40 states" and servicing "more than 1,200 law enforcement partners." Johana Bhuiyan, *How expanding web of license plate readers could be 'weaponized' against abortion*, The Guardian (Oct. 6, 2022, 6:00 EDT), *available at* https://perma.cc/T2UX-BE5E. These statistics are important because even if a particular law

enforcement agency only purchases, say, fifty cameras, that agency has access to information from all Flock cameras other agencies choose to share, not just the cameras it individually leases. "[T]he company has used AI models to support even more intelligent capabilities, such as detecting swapped plates and tracking the same plate across multiple states." Urwin, *supra.* Flock's convoy feature allows the company to identify groups of vehicles travelling together. *See* Mehrotra & Cox, *supra*. And Flock can provide its customers with software that turns their existing IP cameras into ALPR readers through what it calls "Wing" integration. Flock Safety, *Flock Safety Announces the Wing Integration to Distill 1000s of Hours of IP Camera Footage into Searchable Images that Solve Crime*, Globe Newswire (Oct. 20, 2020), *available at* https://perma.cc/LC8U-WVAP.

This expands exponentially the scope of the ALPR system, allowing the agency to access billions of images and thousands of cameras around the country, so long as the owners of those cameras (public or private) are willing to share access to them. As an archived Page from Flock's website boasts: "Use FlockOS's local and national search network to find the suspect vehicle across state lines, including up to 1 billion monthly plate reads. All this is included, for FREE, for any Flock Safety customer" (capitalized emphases in original; bold emphasis added). Jay Stanley, *Fast-Growing Company Flock is Building a New AI-Driven Mass Surveillance System*, ACLU 2 (March 2, 2022), *available at* https://perma.cc/W349-PSUL.

During the relevant period, Flock Safety kept ALPR camera images for thirty days. *Frequently Asked Questions—Privacy and Access*, Flock Safety, https://perma.cc/VHH4-SNSG (archived June 9, 2025).

**2. A parallel ELSAG system blankets the same area.**

The second relevant ALPR system is the ELSAG system, provided by Selex ES and established by the Cuyahoga County Sheriff's Office. (Contract, R. 92-3, Page ID # 2422–49; Redacted Request for Proposals, R. 130-1, Page ID # 2376–92.) This network is hosted by Chagrin Valley Dispatch. (Sealed UASI Funding Request, R. 92-2, Page ID # n/a[1]; Contract, R. 92-3, Page ID # 2422–49.)

Much like the Flock system, the ELSAG cameras take pictures of passing cars that law enforcement officers can search by plate number or vehicle characteristics. (*Id.*; *see, e.g.*, Sealed Report of Investigation, R. 92-11, Page ID # n/a.) It incorporates cameras from both law enforcement and private customers both within Cuyahoga County and other political subdivisions. (Contract, R. 92-3; Redacted Motion to Suppress, R. 93, Page ID # 1350–51; Cuyahoga County List of LPR Cameras, R. 92-5, Page ID # 2612–14.) And an ELSAG camera can "capture" images of nine hundred

[1] Page ID numbers are not available for some of the exhibits to Mr. Sturdivant's Motion to Suppress because they remain under seal and subject to a protective order in the District Court. No protected information is disclosed in this brief.

plates per minute. (Sealed RFP Response, R. 92-6, Page ID # n/a; Contract, R. 92-3, *supra*.)

There are around 1,119 ELSAG ALPR cameras in the greater Cleveland area. (Opinion & Order, R. 103, Page ID # 1947; Email, R. 93-10, Page ID 1624–41.) Images from those cameras are stored for one year. (Sealed RFP Response, R. 92-6, Page ID # n/a; Contract, R. 92-3, *supra*.)

### 3. These systems provide a broad and wide-ranging view of citizens' movements.

At the hearing on the motion to suppress below, both parties agreed that, for the purposes of this case, there is no legally significant difference between the Flock and ELSAG systems. (Opinion & Order, R. 103, Page ID # 1947.) In sum and as shown in the map below, these two systems together give law enforcement access to more than 2,000 ALPR cameras around the area—not counting any privately operated cameras whose data is shared with law enforcement:



*DeFlock Maps*, DeFlock.com, available at: maps.deflock.org, *last accessed* Oct. 21, 2026.

The amount of data that an ALPR system of this sort can collect is staggering. For example, Piedmont, California's mere thirty license plate readers generate somewhere between 1 and 1.4 million records each month. Cyrus Farivar, *Habeas Data: Privacy v. the Rise of Surveillance Tech* 87 (2018). And such comprehensive monitoring provides much more detail than one would think. For example, when a man from San Leandro, California submitted a public records request to see what ALPR data the government had on him, he received more than 100 photos, including wide shots of his car at a coffee shop and a friend's house. *Id.* at 84. And there are at least ***sixty-seven times*** the number of ALPR cameras currently active in the greater Cleveland, Ohio area as there were in Piedmont, California.

Additionally, ALPR cameras can work in conjunction with other government surveillance systems such as Cleveland's Real Time Crime Center cameras, ShotSpotter gunshot detection technology, and cameras owned by private citizens who have registered their cameras with the police. Isabel Lawrence, *Technology helps Cleveland police crack down on crime at Real Time Crime Center*, WKYC (May 23, 2023, updated 7:10 PM EDT), *available at* https://www.wkyc.com/article/news/local/cleveland/cleveland-police-utilize-technology-real-time-crime-center/95-265827ce-4fbb-4af8-b249-ef0327ddd021 (last visited Oct. 29, 2026). Indeed, the systems are designed to do

so. In a webinar—teaching law-enforcement users to surveil, among other things, parades, bike races, Mardi Gras events, and even protests—Flock's director of market management explained that

> police can use FlockOS, a software platform that combines Flock's automatic license plate readers . . . , drones, gunshot detectors, 911 data, and other surveillance cameras (including ones Flock does not own) into a 'single pane of glass' or single piece of software to look at various types of surveillance in one place during both emergencies and relatively mundane events in a city or town.

Jason Koebler, *Flock Taught Cops How to Surveil No Kings Protesters*, 404 Meida (Sept. 3, 2026), *available at* https://perma.cc/3HLS-AP9D. She then highlighted how these tools could be used to surveil the recent "No Kings" political demonstrations. *Id.*

The threat from this sort of system is only growing. Law enforcement agencies are already employing face-recognition software that expands the logic of ALPRs to human faces. *See*, *e.g.*, Kashmir Hill, *Your Face Belongs to Us* (2023) (describing the rise and dangers of facial recognition technology). And, while Flock has disclaimed any intention of adding facial recognition to its devices, other companies are proposing to close that gap: allowing law enforcement agencies to export Flock data and run facial recognition and even object searches across multiple surveillance platforms. *See, e.g.*, *Jason* Koebler, *Surveillance Company Tells Cops It Wants to Add Facial Recognition to Flock Cameras*, 404 Media (Sept. 29, 2026), *available at*

https://perma.cc/CTU5-NEC7. Thus, the warrantless surveillance dragnet Mr. Sturdivant confronted when he was arrested in 2021 pales in comparison to what citizens face today and will soon face in the future.

**B. A series of robberies leaves law enforcement stumped.**

This case began with a series of retail store robberies. On December 5, 2021, a man described only as a black male of tall, slender build robbed two Walgreens stores within a few miles of each other. (Affidavit, R. 1-1 ¶¶ 8–9, 10–13, Page ID # 5–7.) He was seen escaping in what was only described as a black sedan. (*Id.* ¶¶ 8–9, Page ID # 5.)

A few days later, two Family Dollar stores were hit. At the first, a black male in a facemask pointed a gun at employees, demanded they open the cash register, then became impatient when they couldn't do so and left empty-handed. (*Id.* ¶¶ 15–18, Page ID # 7–8.) Witnesses told police the man arrived at the store in a new black Chevrolet Camaro with tinted windows and silver rims. (*Id.*) Less than an hour later, a man matching the same generic, essentially meaningless description (a tall, slender black man in a mask) robbed a Family Dollar twelve miles away. (*Id.* ¶¶ 19–21, Page ID # 8.)

Five days after that, on December 16, a man described as a masked, skinny black male about six feet tall allegedly pointed a gun at a Walgreens cashier and grabbed money out of the register. (*Id.* ¶¶ 23–25, Page ID # 9–10.) He then fled the store in a black sedan. (*Id.*) But a man matching the same description appeared at a CVS six miles away less than an hour later, robbed

the store, and was seen on video fleeing in a black Chevrolet Camero. (*Id.* ¶ 30, Page ID # 12.)

Four additional robberies took place later the same month at various Family Dollar stores in the Cleveland area and involved a man matching the same generic descriptions. (*Id.* ¶¶ 31–40, Page ID # 12–15.) Non-ALPR surveillance camera footage taken from near the scene of the first of these robberies showed a man matching the suspect's description exit and return to a black Chevrolet Camaro with custom rims around the time of the robberies. (*Id.*)

While these descriptions suggested the robberies were related, established a similar MO for the crimes, and painted a relatively consistent portrait of the perpetrator, they ultimately did not give the police much to go on. For example, the footage of the car was not clear enough to make out a plate number. And there certainly was not enough information or clear enough surveillance footage to identify the suspect himself. In short, the police were stumped.

But the police did have one piece of evidence they hoped would help crack the case. Surveillance video from the December 16 Walgreens robbery was clear enough to show that the Camero they were looking for had (1) a temporary license plate hanging in the rear window, and (2) a black-and-white bumper sticker of some sort on the lower right side of the rear bumper. (*Id.*

¶ 27, Page ID #11.) Footage from a nearby gas station showed the same. (*Id.*) The question was how to turn these meager beginnings into an arrest.

**C. Warrantless ALPR searches lead police to Mr. Sturdivant.**

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") began investigating the robberies on December 20. (*Id.* ¶ 41, Page ID # 16.) Without obtaining a warrant, an ATF specialist made more than 150 queries of both the Flock and ELSAG databases looking for a black Chevrolet coupe with a temporary license plate and bumper sticker. (*Id.* ¶¶ 41–42, Page ID # 16-17; Opinion & Order, R. 103, Sealed Willoughby OH PD Flock Audit, R. 92-13.) The natural-language searches (not unlike what you would type into Google) were incredibly broad: For example, his queries included "No Plates," "All Images Temporary Tag," "Black No Plates," "Chevrolet Black All Images," and "Black All Images Temporary Tag Ohio Tennessee Georgia Indiana." (*Id.*) In other words, his queries likely scooped up information on the travels of every person driving a black Chevrolet or with temporary tags across four states, all but one of whom had nothing to do with the alleged robberies.

Relatively quickly, the government located an ALPR image showing a black Chevrolet Camaro with both a temporary tag and black-and-white bumper sticker. (Affidavit, R. 1-1 ¶¶, Page ID #16-18.) The photo was from around three hours after the December 16 robberies, but it placed the Camero within a fifteen-minute drive of the stores. (*Id.* ¶ 42.) Unlike the surveillance

footage from Walgreens, the temporary tag number was visible in the ALPR image. (*Id.*) The government used that temporary license plate number to learn that the Camaro was registered to Mr. Sturdivant. (*Id.* ¶ 43, Page ID # 16-17.)

Having now identified a suspect—on the tenuous basis that his car was near two stores three hours after they were robbed—police learned that Mr. Sturdivant was on parole and matched the physical descriptions of the alleged robber. (*Id.* ¶¶ 43–44, Page ID # 18.) They also learned from his parole officer that he worked at Chipotle. (*Id.* ¶ 46, Page ID # 18-19.) A significant fact, because witnesses at two of the robberies told police the robber wore a Chipotle-branded hat. (*Id.* ¶ 32, Page ID # 12-13.)

On December 26, 2021, a Cleveland Police cruiser saw Mr. Sturdivant driving his Camaro and unsuccessfully tried to get behind the car to pull it over. (Report of Investigation, R. 102-2, Page ID # 1939.) While the District Court felt it was "unknown" whether the officer was aware of the ALPR search hits, (Opinion & Order, R. 103, Page ID # 1950), contemporary text messages between the officer and an ATF agent (which the government belatedly produced and Mr. Sturdivant introduced at hearing) show she did:

> Cleveland Police Department ("CPD") Officer:
> ***I found it*** but ***he*** took off on me. 😂😂😂
> ATF Agent: Lol damn!
> CPD Officer: Looks like ***he's*** headed home now.

| | |
|---|---|
| ATF Agent: | This couldn't have happened at a worse possible time lol. Can't get any AUSA's to approve this warrant. |
| CPD Officer: | But we saw ***him*** come down E 54th or 53rd. And then turned east on fleet and took off. |
| | FUCK |
| | We are sitting on the border right now .. |
| ATF Agent: | Probably looking for another CVS / Family Dollar / Dollar General to hit. I think he's done 2 or 3 in the 4th. |

(Text Messages, R. 102-1, Page ID # 1932–38 (emphasis added).) The messages, after all, not only show the officer and agent discussing having located a particular car (rather than a make and model) but also include references to a particular person (Mr. Sturdivant) and the agent's efforts to get a warrant to support his investigation into that person.

In any event, at around 10:00 p.m. that evening, ***after*** the effort by CPD to stop his car based on the investigation, Mr. Sturdivant reported his car stolen. (Affidavit, R. 1-1 ¶ 47, Page ID # 19.) Meanwhile, law enforcement officers continued to patrol the area and located the car again. (*Id.* ¶ 49.) They found a witness who reported a 5'11'' black male with a thin build had parked the car. (*Id.*) ATF used this information to obtain surveillance footage from the area, which led them to Mr. Sturdivant's girlfriend's home. (*Id.* ¶ 50, Page ID # 20.) Officers would later interview her to tie Mr. Sturdivant to the

robberies—coming away with a positive identification and incriminating statements. (*Id.* ¶¶ 68–77, Page ID # 30-33.)

Building off the original ALPR searches, ATF constructed a 131-page dossier of Mr. Sturdivant's movements in relation to the robberies. (Sealed Timeline with CDRs, R. 92-11, Page ID # n/a.) This dossier contained not only twenty-two separate ALPR hits—eleven from Flock cameras and eleven from ELSAG cameras—but also surveillance data from various fruits of those hits, including surveillance cameras and cell-phone location data (*Id.*). None of which (besides footage from the stores themselves) ATF would have located without identifying Mr. Sturdivant via an ALPR search in the first place. Indeed, ATF's search warrant applications for Mr. Sturdivant's cell-phone data, home, and car relied heavily on the ALPR search results. (Sealed Vehicle Affidavit, R. 92-13, Page ID # n/a; Sealed Residence & Person Affidavit, R. 92-14, Page ID # n/a; Sealed iPhone Affidavit, R. 92-15, Page ID # n/a.)

### D. Mr. Sturdivant is charged and unsuccessfully moves to suppress the evidence against him.

In October 2022, based on this investigation, Mr. Sturdivant was charged with Hobbs Act robbery (Counts 1, 2, 4, 5, 7, 8, 10, 11, 12, 13), carrying a firearm during a crime of violence (Counts 3, 6, 9), and possessing ammunition as a felon (Count 14). (Indictment, R. 20, Page ID # 95–104.)

Mr. Sturdivant responded by moving to suppress the evidence against him, arguing that the warrantless ALPR searches used to identify him violated the Fourth Amendment. (Sealed Motion to Suppress, R. 92; Redacted motion to Suppress, R. 93, Page ID # 1345–74.) While acknowledging the case presented "a close and difficult constitutional question," the District Court denied that motion. (Opinion & Order, R. 103, Page ID # 1941.)

Based on that decision, Mr. Sturdivant pleaded guilty to the charges in the Indictment. (Plea Agreement, R. 138 ¶ 2, Page ID # 2775.) But his plea agreement included a specific carve-out permitting him to appeal the Court's decision denying his motion to suppress. (*Id.* ¶ 19, Page ID # 2780–81.)

At sentencing, the District Court expressed sympathy for Mr. Sturdivant (who suffers from PTSD, depression, and suicidal ideations, in addition to the effects of a learning disability) and encouraged him to pursue his appeal so this Court could provide "additional guidance and development on the law" as to ALPRs, especially considering *Chatrie*. (Sentencing Transcript, R. 152, Page ID # 2997, 2999.) Even so, it sentenced him to 352 months in prison, 5 years of supervised release, in addition to restitution and a special assessment. (Judgment, R. 139, Page ID # 2807–08, 2812.)

This appeal followed. (Notice of Appeal, R. 142, Page ID # 2858.)

## SUMMARY OF THE ARGUMENT

The federal courts are "obligated—as subtler and more far-reaching means of invading privacy have become available to the Government—to

ensure that the progress of science does not erode Fourth Amendment protections." *Chatrie*, 609 U.S. at 641 (cleaned up). Over the past several years, the government has developed a massive dragnet surveillance system of hundreds of ALPR cameras. These cameras are linked to a multitude of other surveillance systems to track hundreds of thousands of citizens' movements within their jurisdiction without any basis (let alone probable cause) to suspect they committed any crime. Not only that, but the government argued below and the District Court held that officers may query the resulting database as they please without any oversight by a neutral magistrate or, indeed, any third party at all. All because citizens drive on public roadways with a visible (or even a blurry) license plate. That is not the law.

The Supreme Court has recognized since its decision in *United States v. Jones*, that people have a reasonable expectation of privacy in their historical physical movements—even in a car and even on public streets. *Jones*, 565 U.S. 400, 430 (2012) (Alito, J., concurring); *id.* at 415 (Sotomayor, J., concurring). It has repeatedly reaffirmed that holding since *Jones*, requiring police to obtain a warrant before obtaining historical location data from cell phone providers or asking technology companies to perform a "geofence" search tracking all users in a specified area. *Chatrie*, 609 U.S. at 611; *Carpenter*, 585 U.S. at 309–10.

ALPR surveillance raises the same constitutional concerns as the data at issue in *Chatrie* and *Carpenter*. The data collected from ALPR surveillance,

especially when provided with other surveillance systems, provides an intimate window into a person's life. ALPR surveillance also runs automatically, costs far less than traditional surveillance, targets everyone regardless of their conduct, is unavoidable, and provides a retrospective historical record of a person's movements. Indeed, the only meaningful difference between the ALPR system here and the data collected in *Chatrie* and *Carpenter* is that ALPR data is collected directly by the government or its contractors—magnifying the dangers to civil liberties and removing any potential argument that citizens consented to the surveillance by opting into a commercial service (like a cell phone plan).

Nor can any exception to the warrant requirement save the searches in this case. Because the government can articulate no truly independent, non-speculative means by which it would have identified Mr. Sturdivant absent the ALPR queries, its inevitable discovery defense is meritless. And the good-faith exception does not apply, because no binding precedent or other external, unequivocal authority told the ATF it could query ALPR data without a warrant.

The District Court thus erred in denying Mr. Sturdivant's motion to suppress. This Court should vacate Mr. Sturdivant's conviction and sentence, reverse the District Court's ruling on his motion, and remand the case for further proceedings.

## ARGUMENT

"When reviewing a district court's decision concerning a motion to suppress evidence, an appellate court reviews findings of fact under the clear-error standard and reviews conclusions of law *de novo.*" *United States v. Waide*, 60 F.4th 327, 335 (6th Cir. 2023) (cleaned up). Here, the District Court erred by dismissing the similarities between ALPR searches and other digital surveillance methods the Supreme Court has held require a warrant. And the government's alternative arguments provide no basis for affirming the District Court's decision despite that error. This Court should reverse and hold that ALPR-based surveillance queries are searches under the Fourth Amendment.

### A. ALPR queries invade citizens' reasonable expectations of privacy and are a search under the Fourth Amendment.

For Fourth Amendment purposes, law enforcement officers conduct a "search"—and, thus, generally require a warrant—when they intrude on a person's "reasonable expectation of privacy." *United States v. Fellmy*, 165 F.4th 501, 505 (6th Cir. 2026); *Mockeridge v. Harvey*, 149 F.4th 826, 833 (6th Cir. 2025). An expectation of privacy is reasonable where, (1) the person exhibits an actual, subjective expectation of privacy, and (2) that expectation is one that society recognizes as reasonable. *United States v. Rogers*, 97 F.4th 1038, 1041–42 (6th Cir. 2024).

While "no single rubric definitively resolves which expectations of privacy are entitled to protection," the Supreme Court has "recognized some

basic guideposts" that are "informed by historical understandings 'of what was deemed an unreasonable search and seizure when [the Fourth Amendment] was adopted.'" *Carpenter*, 585 U.S. at 304–05 (quoting *Carroll v. United States*, 267 U.S. 132, 149 (1925)) (alteration in original). First, the Fourth Amendment "seeks to secure 'the privacies of life' against 'arbitrary power.'" *Id.* at 305 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). Second, "a central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'" *Id.* (quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)). And third, "[a]s technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes," the federal courts have "sought to 'assure [ ] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.'" *Id.* (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)).

Mindful of these guideposts, the Supreme Court has repeatedly held that people have a reasonable expectation of privacy in the record of their physical movements over time. *Chatrie*, 609 U.S. at 623–24; *Carpenter*, 585 U.S. at 310; *Jones*, 565 U.S. at 430 (Alito, J., concurring); *id.* at 415 (Sotomayor, J., concurring). And this is true even if those movements take place in the public sphere, while they are travelling on open roads and in plain view. *Carpenter*, 585 U.S. at 310; *Jones*, 565 U.S. at 430 (Alito, J., concurring);

*id.* at 415 (Sotomayor, J., concurring). ALPR cameras invade this reasonable expectation of privacy.

#### 1. ALPR data, like cell-phone location data, provides an intimate window into a person's life.

To begin with, the location data collected by ALPR surveillance systems is legally indistinguishable from the data at issue in *Chatrie*, *Carpenter*, and *Jones.* The District Court erred by concluding otherwise.

As the Supreme Court explained in *Carpenter*, "[p]rior to the digital age, law enforcement might have pursued a suspect for a brief stretch, but doing so 'for any extended period of time was difficult and costly and therefore rarely undertaken.'" *Carpenter*, 585 U.S. at 310 (quoting *Jones*, 565 U.S. at 429 (Alito, J., concurring)). "For that reason, 'society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period.'" *Id.* (quoting *Jones*, 565 U.S. at 430 (Alito, J., concurring)).

Beyond that, location data opens "an intimate window into a person's life." *Id.* at 311. After all, as the Fourth Circuit recognized in striking down a drone-based surveillance program (one that, by the by, could not display cars or people as more than indistinct blobs or dots), "it is almost always possible to identify people by observing even just a few points of their location history." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330,

343 (4th Cir. 2021). Such data "may collect information about your activities that you may not want the government to keep a record of: where you slept last night, what gun stores you go to, what mosque you attend, what doctor you visit, what sex-toy shop you like, what marijuana dispensary you frequent, or what gay bar you prefer." Farivar, *supra*, at 86; *see also Carpenter*, 585 U.S. at 311 ("[T]ime-stamped [location] data provides an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.")

The location data collected by the ALPR systems here exposes this sensitive information to law enforcement to at least the same extent as the data at issue in *Carpenter* and *Chatrie*. Via their electronic eyes, people traveling through Northeast Ohio and beyond are constantly being monitored in their everyday comings and goings. This data is stored for an extended period (by policy at the time of the motion, 30 days for Flock and 265 days for ELSAG cameras) and is accessible to nearly every law enforcement agent at their discretion—allowing them to piece together a detailed chronical of individual's daily movements.

That is what happened to Mr. Sturdivant. His vehicle, like all other vehicles travelling Cuyahoga County's roads in December 2021, was systemically tracked by the ALPR system. Using this information, and additional information derived from its warrantless ALPR queries, law enforcement retrospectively created a detailed analysis of his travel, as shown

by the government's 131-Page PowerPoint comprehensively tracking his alleged movements using ALPR cameras, public surveillance camera footage, and cell-phone geolocation data. Further, while the series of robberies occurred between December 5, 2021, and December 26, 2021, the government has produced evidence in discovery showing ALPR scans of Mr. Sturdivant's vehicle going all the way back to November 13, 2021—three weeks before any of the crimes had even occurred. (*See* Sealed ELSAG Camero Scans, R. 92-17.) Storing that much location information and accessing that information without a search warrant is an invasion of every citizen's reasonable expectation of privacy, not just Mr. Sturdivant's.

The District Court's contrary reasoning is unpersuasive.

***First***, in holding that *Carpenter*'s reasoning does not apply to ALPR queries, the District Court relied heavily on the idea that, because ALPRs sit at staggered intersections, they could not "recreate the direct path of Mr. Sturdivant's car" and "provided discrete data points with considerable stretches of obscurity." (Opinion & Order, R. 103, Page ID # 1964.) And the Fifth Circuit (pre-*Chatrie*) adopted a similar rationale. *Porter*, 170 F.4th at 386–87. But both ignore the actual level of precision at issue in the *Carpenter* case. While the Supreme Court recognized that cell-site location information ("CSLI") was "rapidly approaching GPS-level precision," the actual data at issue could only track a suspect's location to "within a wedge-shaped sector ranging from one-eighth to ***four square miles***." *Carpenter*, 585 U.S. at 312

(emphasis added). That is hardly precise data that allowed police to recreate Carpenter's direct path and avoid "considerable stretches of obscurity." Similarly, in *Leaders of a Beautiful Struggle*, the Fourth Circuit was unpersuaded by arguments that the drone-surveillance system in that case collected information only during daylight hours, noting that "[t]he datasets in *Jones* and *Carpenter* had gaps in their coverage, too." 2 F.4th at 342–43.

Thus, GPS-level precision is not required for a query of location data to be a search: The need for inference—i.e., the need to combine ALPR data with other information to deduce a log of Mr. Sturdivant's movements—does not insulate a search from the warrant requirement. *Id.* at 345. Indeed, in *Chatrie*, the Supreme Court re-emphasized the relative ***imprecision*** of the CSLI at issue in *Carpenter* as a reason to require a warrant for the more precise location history information available in the geofence context. 609 U.S. at 625–26. And yet, it still said the "resemblances between CSLI and Location History, in their relationship to personal privacy, practically leap off the Page." *Id.* at 625. Likewise, the Fourth Circuit stressed the ability to "cross-reference" tracking information from drone surveillance with "publicly available information and, even more valuably, their own data systems" in evaluating the invasiveness of the drone program at issue in that case. *Leaders of a Beautiful Struggle*, 2 F.4th at 344.

Plus, CSLI is not keyed to a location transmitted by a cell phone: It records the phone's location at set points in time relative to fixed cell towers

(not unlike how an ALPR system records a car's location in relation to a fixed ALPR camera). CSLI data thus only tells officers what cell tower is closest to a suspect at any given time and, at best, which of the tower's nodes (each covering 120 degrees) is pointed toward the cell phone. *See* National Association of Criminal Defense Lawyers (NACDL) Primer, *Cell Phone Location Tracking*, *available at* https://perma.cc/VJ2A-VCDM; Chathura Illangakoon, R. D. McLeod, Marcia Friesen, *Agent Based Modeling of Malaria*, 2014 IEEE Canada International Humanitarian Technology Conference, at 6 (July 2015), *available at* https://ieeexplore.ieee.org/stamp/stamp.jsp?tp=&arnumber=7147546 (last visited Oct. 30, 2026). Indeed, the government's own presentation documenting Mr. Sturdivant's movements, which includes the CSLI it obtained based on the ALPR hits, reveals the same limitation:



(Sealed Timeline with CDRs, R. 92-11.) In fact, as the District Court recognized, ALPR cameras are, in some ways *more* precise than CSLI, because ALPR cameras place a car at a particular intersection at particular time, not simply within a wedge-shaped area around a cell tower. (Opinion & Order, R. 103, Page ID # 1965–66.)

At any rate, the point here is that the precision of CSLI is dependent on the density of cell towers in a particular area, just as the precision of location data from ALPR surveillance is dependent on the density of ALPR cameras. Yet the Supreme Court in *Carpenter* did not ask how dense the concentration of cell towers in the area was before concluding that CSLI queries amount to a search. There is no reason to treat ALPR cameras any differently.

***Second***, the District Court (like the Fifth Circuit) relied heavily on the fact that ALPR cameras track cars rather than cell phones, noting that cars do not follow people off roadways and are generally subject to less Fourth Amendment protection than other locations. (Opinion & Order, R. 103, Page ID # 1954–57, 1962, 1964.); *see also Porter*, 170 F.4th at 386–87. And it is true that motorists have "no reasonable expectation of privacy in the information contained on [a] license plate," *United States v. Ellison*, 462 F.3d 557, 561 (6th Cir. 2006), and a diminished expectation of privacy in a car more generally, *see, e.g.*, *New York v. Class*, 475 U.S. 106, 112–13 (1986). But that changes nothing for one simple reason: The Supreme Court already rejected this

argument more than 14 years ago in *Jones*—the case that first recognized a reasonable expectation of privacy in one's movements.

*Jones* held that police officers needed a warrant to place a GPS tracker on a suspect's vehicle. 565 U.S. at 404. While the Opinion of the Court based that holding on the physical trespass involved, *id.* at 404–11, five justices nonetheless concluded that use of a GPS tracker to monitor the car's movements violated the driver's reasonable expectation of privacy. *Id.* at 415 (Sotomayor, J., concurring); *id.* at 430 (Alito, J., concurring) (joined by Justices Ginsburg, Breyer, and Kagan). In other words, the seminal location-data case—the case that both *Carpenter* and *Chatrie* cite extensively and build on—involved tracking someone's location by tracking their car (just as ALPR cameras do). And the justices in *Jones* raised the same privacy concerns they would later highlight in *Carpenter* and *Chatrie*. *Compare Jones*, 565 U.S. at 415 (Sotomajor, J., concurring) ("GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations."), *with Carpenter*, 585 U.S. at 311 ("As with GPS information, the time stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." (internal citations and quotation marks omitted)).

Put another way, Mr. Sturdivant is not asking this Court to upset decisions governing warrantless car searches, or to find a privacy interest in his license plate number standing alone, or even to require a warrant to look up that number in a database to discover who a car is registered to. It is simply asking that the Court protect the same privacy interest in his physical movements the Supreme Court recognized in *Jones*, *Carpenter*, and (most recently) *Chatrie*.

***Finally***,[2] the District Court noted that, whatever the potential for ALPR data to reveal personal information in other cases, the data at issue here did not reveal intimate information about Mr. Sturdivant. But the Supreme Court rejected precisely that rationale in *Chatrie*, noting that courts "have never understood Fourth Amendment protections as kicking in only once an intrusion 'goes too far'" and that "[w]hether something is a search does not depend on what it finds." 609 U.S. at 629, 632(quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). "An officer, after all, cannot know the fruits of a given surveillance in advance. The surveillance must be either a

[2] The District Court (like several other courts addressing warrantless ALPR queries before *Chatrie*) also relied on language in *Carpenter* stressing the limited scope of the question before the Supreme Court in that case. (Opinion & Order, R. 103, Page ID # 1962–63.) But the Supreme Court rejected that reasoning in *Chatrie*, describing the *Carpenter* decision as its "most recent decision . . . to consider the Fourth Amendment's application to new surveillance technologies" (not merely to CSLI or other cell-phone based location data) and brushing aside the dissent's argument that the majority should have focused on "earlier Fourth Amendment decisions" rather than *Carpenter*. 609 U.S. at 624 n.7.

search or not regardless." *Id.* at 632. The potential of ALPR surveillance to reveal the "privacies of life" is enough to make querying the resulting data a search under the Fourth Amendment.

Beyond that, the District Court's factual finding is wrong. The ALPR queries here allowed police to identify Mr. Sturdivant's girlfriend and even note when he slept at her house rather than his own. While the District Court claims that law enforcement identified her "through conventional investigative means after identifying Mr. Sturdivant as the owner of the suspect vehicle," (Opinion & Order, R. 103, Page ID # 1965), that elides the undisputed fact that law enforcement was only able to "identify" Mr. Sturdivant as the owner using the ALPR searches. Plus, the "traditional investigative means" that led from the identification to Mr. Sturdivant's love life were (1) an attempted traffic stop based on the ALPR identification, and (2) querying other surveillance systems (namely CCTV cameras) based on that failed stop. In other words, but for the ALPR search and "inferences" based on it, law enforcement would not have known who Mr. Sturdivant's girlfriend was or when he stayed with her.

In short, the granularity and invasiveness of ALPR data is not meaningfully different from the data the Supreme Court considered in *Carpenter*, and this Court should hold that ALPR queries are a search under the Fourth Amendment.

### 2. ALPR surveillance is automatic, indiscriminate, inescapable, inexpensive, and retrospective.

But the similarities don't stop there. ***First***, like the location data in *Chatrie* and *Carpenter*, ALPR surveillance is automatic and indiscriminate by design, capturing and storing images of ***every*** passing vehicle. Thus, "this newfound tracking capacity [of searching ALPR data] runs against everyone"—precisely the type of warrantless governmental intrusion that was rejected by *Carpenter*. 585 U.S. at 312; *see Chatrie*,609 U.S. at 634–35. The resulting data is retained and added to large databases regardless of whether the individual driving the vehicle is implicated in a crime or doing anything suspicious. And there it sits: an eerily precise record of a citizen's movements simply waiting for the government to need it, all on the ***assumption*** that some or all of them will at some point commit a crime or otherwise become interesting to the government.

***Second***, collection is inescapable. Like cell phone users exposing their information to phone companies, drivers are not voluntarily turning over their location data to private companies or to law enforcement in any meaningful sense. To exist and participate in society, individuals need to leave their homes and travel the public roads. In *Carpenter*, the Supreme Court noted that cell phones are "almost a 'feature of human anatomy.'" 585 U.S. at 311 (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)). Car ownership is almost as ubiquitous as cell phone ownership in the United States. *Compare* Pew Research Center Mobile Fact Sheet, published October 19, 2026, *available at*

https://perma.cc/M5VY-2YC4 ("The vast majority of U.S. adults (98%) own a cell phone of some kind."), *with* Forbes Advisor, *Car Ownership Statistics 2024*, updated March 28, 2024, *available at* https://www.forbes.com/advisor/car-insurance/car-ownership-statistics/ ("Most U.S. households (91.7%) had at least one vehicle in 2022 (the latest data available) . . ."). Because every driver is required by law to have a license plate, none of these drivers (nor the millions of others around the country) can opt out of ALPR surveillance.

In fact, it is easier to opt out of cell-phone location tracking than ALPR surveillance. At least a person can turn off their phone, disable location tracking features, or toss the phone in a Faraday bag to avoid being tracked. In many, if not most parts of the United States, a person cannot avoid driving if they want to get to work, buy groceries, attend church, or go to a doctor's appointment. When they do, they are legally required to have a license plate on their car, and, thus, can be tracked by ALPR systems. When technological advances like facial recognition are added to the mix, it may be difficult even to step outside your house without being tracked.

***Third***, the data collected is cheap and retrospective giving "police access to a category of information otherwise unknowable." *Carpenter*, 585 U.S. at 312. "In the past, attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection." *Id.* But with ALPR systems, law enforcement "can now travel back in time to retrace a

person's whereabouts" subject only to its retention policies. *Id.*; *see also Chatrie*,609 U.S. at 634. Thus, unlike the GPS data in *Jones* and other earlier surveillance models, "police need not even know in advance whether they want to follow a particular individual, or when." *Carpenter*, 585 U.S. at 312.

Drivers may not have an expectation of privacy when it comes to isolated observations of their license plate or vehicle registration while driving on public roads, which is more analogous to driving past a stationary cruiser. *See United States v. Miranda-Sotolongo*, 827 F.3d 663, 667 (7th Cir. 2016) (citing cases); *see also United States v. Matthews*, 615 F.2d 1279, 1285 (10th Cir. 1980). But Mr. Sturdivant's case presents a different scenario: ALPR surveillance is not an isolated reading or input of a license plate into a database. Comparing a single reading of a plate to a proactive and retroactive search of hundreds of thousands of people's location information is like comparing "a ride on horseback . . . [to] a flight to the moon. Both are ways of getting from point A to point B, but little else justifies lumping them together." *Riley*, 573 U.S. at 393.

ALPR surveillance (like GPS tracking and CSLI tracking) is also much cheaper, allowing law enforcement "[w]ith just a click of a button" to "access [a] deep repository of historical location information at practically no expense" *Cf. Carpenter*, 585 U.S. at 311; *see also Jones*, 565 U.S. at 415–16 (Sotomayor, J., concurring) ("And because GPS monitoring is cheap in comparison to conventional surveillance techniques and, by design, proceeds

surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices: 'limited police resources and community hostility.'"); *id.* at 429 (Alito, J., concurring) ("In the precomputer age, the greatest protections of privacy were neither constitutional nor statutory, but practical. Traditional surveillance for any extended period of time was difficult and costly and therefore rarely undertaken. The surveillance at issue in this case—constant monitoring of the location of a vehicle for four weeks—would have required a large team of agents, multiple vehicles, and perhaps aerial assistance.").

Thus, the vast network of cameras and accompanying database of location information that make up an ALPR system "has afforded law enforcement a powerful new tool . . . [which also] risks Government encroachment of the sort the Framers, 'after consulting the lessons of history,' drafted the Fourth Amendment to prevent." *Carpenter*, 585 U.S. at 320 (quoting *Di Re*, 332 U.S. at 595). That new tool changes the Fourth Amendment analysis. The question for this Court is not whether there is a right to privacy in the isolated observation of a visible license plate on a public road. Rather, the question is whether people have "a reasonable expectation of privacy that is violated when the Government, without any basis whatsoever to suspect them of any wrongdoing, collects, and stores for [ ] years their [license plate location data] for purposes of subjecting it to high-tech querying and analysis without any case-by-case judicial approval."

*Klayman v. Obama*, 957 F.Supp.2d 1, 37 (D.D.C. 2013). Surely the answer is yes.

### 3. Warrantless ALPR surveillance is inconsistent with the original understanding of the Fourth Amendment.

Also like GPS tracking, CSLI surveillance, and Location History data collection, ALPR surveillance runs contrary to the expectations of the founding generation. That is, the Supreme Court has told us, yet another reason to find that new surveillance techniques amount to a search. *See Chatrie*, 609 U.S. at 621–22 ("The [Supreme] Court . . . has sought to assure [ ] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."); *Carpenter*, 585 U.S. at 296–97 ("The analysis regarding which expectations of privacy are entitled to protection is informed by historical understandings 'of what was deemed an unreasonable search and seizure when [the Fourth Amendment] was adopted.' These Founding-era understandings continue to inform this Court when applying the Fourth Amendment to innovations in surveillance tools." (quoting *Carroll*, 267 U.S. at 149).[3]

[3] Indeed, judges have even suggested that direct resort to original understandings provide a surer guide to interpreting the Fourth Amendment than the traditional "reasonable expectation of privacy test." *See, e.g., Morgan v. Fairfield Cnty.*, 903 F.3d 553, 56–68 (6th Cir. 2018) (Thapar, J., concurring in part and dissenting in part). But whether one views original understandings as a replacement for the *Katz* test or a factor in deciding whether an expectation of privacy is reasonable, those understandings support Mr. Sturdivant's position in this case.

Founding-era sources converge on a common definition of a "search": purposeful investigative conduct. *See generally* John Wrench, *The Original Meaning of 'Searches,'* 29 Pa. J. Const. L. __ (forthcoming 2027), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6303338. For example, Samuel Johnson's 1773 dictionary defined a "search" as an "[i]nquiry by looking into every suspected place." 2 Samuel Johnson, *Dictionary of the English Language* (4th ed. 1773), *available at* https://perma.cc/J4L4-LQQ8. Noah Webster similarly defines it as "[a] seeking or looking for something that is lost, or the place of which is unknown." 2 Noah Webster, *An American Dictionary of the English Language* 66 (1828), *available at* https://perma.cc/VJB5-XFBU. And the earliest Supreme Court case to consider the issue emphasized a similar understanding. *See Boyd*, 116 U.S. at 630 ("It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty and private property . . . .").

Thus, there can be little doubt that the Revolutionary generation would have viewed efforts to find a person—whether through technological means or otherwise—as a search. After all, Eighteenth-century justice of the peace manuals included templates for warrants to, among other things, "***search*** for a lost child." *See, e.g.*, James Parker, *Conductor Generalis: or, the Office, Duty and Authority of Justices of the Peace* 461 (1764), *available at*

https://bit.ly/4bEcyYR (emphasis added). And even more commonplace efforts to "raise a hue and cry" to search for suspected persons sometimes required a warrant. *See* Laura K. Donahue, *The Original Fourth Amendment*, 83 U. Chi. L. Rev. 1181, 1233–35 (2016), *available at* https://perma.cc/9GRE-8JMB (noting that constables were sometimes required to refer complainants "to a justice of the peace, and act upon his warrant" before raising a hue and cry) (internal quotation marks omitted); *cf.* Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 622-23 n.198 (1999), *available at* https://perma.cc/VET8-AQXA (noting that before the hue and cry fell into disuse in the late eighteenth-century, justice manuals recommended "procur[ing] a hue and cry warrant").

The Founders also would have found warrantless dragnet surveillance (like ALPR, CSLI, or Location Tracking) unreasonable. Typically, reasonableness, at that time, turned on whether a search or seizure was "against the reason of the common law." *See* Donahue, *supra*, at 1270–76; Davies, *supra*, at 555 n.5, 687–93. The Framers' understanding of what that meant reflected an evolving consensus against abusive colonial practices, such as general warrants. *See, e.g.*, Tracey Maclin, *Informants and the Fourth Amendment: A Reconsideration*, 74 Wash. U. L.Q. 573, 582–83 (1996), *available at* https://perma.cc/XU2T-QS5F. In the text of the Fourth Amendment, the drafters framed this consensus in terms of the right of citizens to be "secure" in their person, homes, and effects. U.S. Const., amend. IV. The question,

then, is whether an ordinary, law-abiding person would feel secure in their home or person if the government was free to conduct a certain type of search without judicial oversight. *See, e.g.,* Jed Rubenfeld, *The End of Privacy*, 61 Stan. L. Rev. 101, 131 (2008), *available at* https://perma.cc/D9JJ-X6YH ("[J]udges must ask what the effect would be on the people's right of security if the surveillance . . . power the government has asserted were to be systematically implemented.").

Whatever might be said of other behavior (such as watching a car go by from a police cruiser or looking up a vehicle's plate number in a registration database), an ordinary person at the founding would not have felt secure if government officials could tail them at will, without suspicion, for an indefinite period of time. Surely, that is simply table stakes. *See, e.g., Jones*, 565 U.S. at 420 & n. 3 (Alito, J., concurring) ("[I]t is almost impossible to think of late–18th-century situations that are analogous to what took place in this case. (Is it possible to imagine a case in which a constable secreted himself somewhere in a coach and remained there for a period of time in order to monitor the movements of the coach's owner?) . . . "[T]his would have required either a gigantic coach, a very tiny constable, or both—not to mention a constable with incredible fortitude and patience.").

In the end, ALPR surveillance is nothing more than "a 21st century general search, enabling the police to collect all movements, both innocent and suspected, without any burden to articulate an adequate reason to search for

specific items related to specific crimes." *Leaders of a Beautiful Struggle*, 2 F.4th at 348 (internal quotation marks omitted). As such—just as the Supreme Court found as to GPS, CSLI, and Location History tracking—allowing the government to conduct warrantless ALPR queries flies in the face of the federal court's obligation to preserve "that degree of privacy against government that existed when the Fourth Amendment was adopted." *Jones*, 565 U.S. at 406.

#### 4. ALPR surveillance poses a greater risk to liberty and privacy than cell-phone location data.

There is, however, at least one way ALPR surveillance is different from the data at issue in *Carpenter* and *Chatrie*: ALPR surveillance poses an even ***greater*** risk to citizens' reasonable expectation of privacy.

The data in *Carpenter* and *Chatrie* was collected by a third-party unaffiliated with the government for primarily commercial reasons—such as allowing a cell phone or the apps on it to function properly. It was only incidentally useful for law enforcement and could only be obtained by serving process of some kind on the cell phone provider. Beyond that, in *Chatrie*, law enforcement had worked with Google to design a three-step request process that would limit the data available to the government. 609 U.S. at 615. In the first step, Google would produce anonymized location data for all cell phones within a geofence (typically a circle with a designated radius). *Id.* The data would show the phone's location every two minutes within the fence. *Id.* At

the second step, the government (after reviewing the initial data) would ask for additional information for a subset of still-anonymized users—often for a longer time period and including location data for the user outside the geofence. *Id.* Finally, at the third stage, the government would ask for the names of a further subset of users. *Id.* This process was laid out in the warrant application the government used to obtain a geofence warrant in *Chatrie*. *Id.* at 616–17.

Not so for ALPR data. The data is collected directly by the government (or its contractors) for a purely law-enforcement purpose: detecting crime and apprehending suspects. ALPR queries are subject to no scope restrictions—at the very least, the government presented no evidence showing any were applied in this case. And there is no third-party check on the government at all, whether public or private.

ALPR surveillance thus strikes at the "very heart of the Fourth Amendment['s] directive: that, where practical, a governmental search and seizure should represent both the efforts of the officer to gather evidence of wrongful acts and the judgment of the magistrate that the collected evidence is sufficient to justify invasion of a citizen's private premises or conversation." *United States v. U.S. District Court*, 407 U.S. 297, 316 (1972); *see also Leaders of a Beautiful Struggle*, 2 F.4th at 346–47 ("Under the [drone] program, the government does both [the collection and querying of location data]. . . . Allowing the police to wield this power unchecked is anathema to the values

enshrined in our Fourth Amendment."). "This judicial role accords with our basic constitutional doctrine that individual freedoms will best be preserved through a separation of powers and division of functions among the different branches and levels of Government." *U.S. District Court*, 407 U.S. at 317.

Indeed, there is already reason to think that the government's untrammeled access to ALPR data has led to abuse. An investigation by the Electronic Frontier Foundation revealed that more than 80 U.S.-law-enforcement agencies conducted searches targeting Romani people, conducting hundreds of queries using terms like "roma" and even racial slurs without mentioning any suspected crime. Sarah Hamid, *EFF's Investigations Expose Flock Safety's Surveillance Abuses: 2025 in Review*, Electronic Frontier Foundation (Dec. 30, 2025), available at https://perma.cc/6DH9-T6EW. Numerous law enforcement officers have been accused or even convicted of using ALPR systems to track people for personal, rather than official reasons, including police chiefs in Kansas and Georgia and a Milwaukee officer who used Flock's cameras to locate his girlfriend and her ex-boyfriend more than 170 times over two months. James Lartey, *The Troubling Personal Side of Public Surveillance*, The Marshall Project (March 7, 2026), *available at* https://www.themarshallproject.org/2026/03/07/police-camera-wisconsin-california-colorado. And, as discussed above, law enforcement has used (and Flock has encouraged them to use) ALPR cameras to monitor political demonstrations. Indeed, Flock uses "mobile security trailers" to transport

ALPR cameras to events and establish an event parameter capable of identifying attendees (a function also served by vehicle-mounted ALPR cameras). Urwin, *supra*.

All of which goes to show why, as the Supreme Court has long held, that Fourth Amendment freedoms "cannot properly be guaranteed if domestic security surveillances may be conducted solely within the discretion of the Executive Branch." *U.S. District Court*, 407 U.S. at 316–17. "History abundantly documents the tendency of Government—however benevolent and benign its motives—to view with suspicion those who most fervently dispute its policies." *Id.* at 314. "The price of lawful public dissent must not be a dread of subjection to an unchecked surveillance power." *Id.*

In sum, CSLI and Location History data at least come swathed in sheep's clothing, promising customers enhanced cell-phone functionality and only the ancillary possibility that the government might use your phone to conduct dragnet surveillance. ALPR surveillance makes no pretensions to innocence: "[T]his wolf comes as a wolf." *Cf. Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

* * *

In the end,the technology "is new, but the principle covering it is not: That principle is instead the one our history has given." *Chatrie*,609 U.S. at 641. "The Fourth Amendment must, as ever, protect against unjustified governmental intrusion on the privacy of the individual." *Id.* Here, that means

holding that ALPR queries are a search and require a warrant, absent an applicable exception to the warrant requirement. That conclusion should have been clear based on *Carpenter*, but it is unavoidable considering *Chatrie*. Indeed, since *Chatrie*, at least one Court has acknowledged as much. *United States v. Kyle*, No. 26-cr-189, 2026 WL 2958728, at *12–14 (N.D. Okla. Oct. 1, 2026). And considering the continuing expansion of ALPR systems and the ways that technology appears poised to become more precise and invasive (e.g., by incorporating facial recognition), the basis for finding a Fourth Amendment violation has only grown more persuasive since Mr. Sturdivant's arrest. *See Carpenter*, 585 U.S. at 313 (considering the extent to which CSLI had become more accurate since the beginning of that case).

"It may well be that, in the instant case, the Government's surveillance. . . readily would have gained prior judicial approval." *U.S. District Court*, 407 U.S. at 317. But courts may not sustain "a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end." *Id.* (internal quotation marks omitted). "The Fourth Amendment contemplates a prior judicial judgment, not the risk that executive discretion may be reasonably exercised." *Id.* Because that judgment was absent here, the District Court erred in upholding the government's ALPR queries in this case.

### B. Officers would not have inevitably connected Mr. Sturdivant's car to the robberies.

While the District Court did not reach the issue, the government argued below that—even if ALPR queries are a search—the evidence it collected via ALPR queries is nonetheless admissible under the inevitable discovery exception. It is not.

The inevitable discovery exception "allows admission of unlawfully obtained evidence if the government can 'establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Lazar*, 604 F.3d 230, 239 (6th Cir. 2010) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "To establish inevitable discovery, the government must show that the evidence would have been acquired lawfully through an independent source absent the government misconduct." *Id.* The question is: "Viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred?" *United States v. Cooper*, 24 F.4th 1086, 1092 (6th Cir. 2022).

In answering this hypothetical, there are several guiding principles. ***First***, while considering what would have happened absent an illegal search "inherently requires some conjecture, . . . courts must 'keep speculation at a minimum by focusing on demonstrated historical facts capable of ready verification or impeachment.'" *Id.* at 1094 (quoting *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999)) (some internal quotation marks and citations

omitted). ***Second***, "[b]ecause inevitable discovery asks what would have happened had the illegality not occurred, courts may rely on post-illegality events only if they would have occurred in [the] counterfactual scenario." *Id.* at 1095.

Here, the government has claimed that—because Mr. Sturdivant reported his car stolen ***after*** the police tried to stop him—it was inevitable that law enforcement would have identified and arrested him. (Redacted Opposition to Motion to Suppress, R. 98, Page ID # 1902–04.) But that position is wrongheaded on at least three fronts.

***First***, the government has not met its burden to show that the stolen-vehicle report was, in fact, independent of the ALPR search. Indeed, the records shows the opposite: Two Cleveland Police Officers tried to stop Mr. Sturdivant on December 26, 2021, based on the license plate number the government only obtained through the ALPR search. There is no other plausible way to read the officers' text messages, which discuss a specific vehicle and suspect, not a vehicle meeting a generic description. Mr. Sturdivant reported the vehicle stolen the same evening—a clear demonstration of cause in effect.

As the government itself recognized, (*id.*, at Page ID # 1903), the inevitable discovery doctrine, which allows police to use evidence collected in an unconstitutional search, requires a compelling reason—such as an independent, untainted investigation—to believe that police would have

found the evidence "had the illegality never occurred." *See Cooper*, 24 F.4th at 1091–94. Here, (1) the officers who performed the attempted stop knew the license plate number of Mr. Sturdivant's car because of the ALPR search, and (2) that attempted stop motivated him to make the stolen-vehicle report. Thus, the taint from the unconstitutional search extends to the stop and report. And the inevitable discovery exception does not apply.

***Second***, even if the stolen-vehicle report had not been tainted by the earlier ALPR search (which it was), the government has not proved that it would have led law enforcement to evidence of the robberies underlying Mr. Sturdivant's indictment. The reason for that is simple: Government agents did not find ***any*** incriminating evidence in Mr. Sturdivant's car. Thus, even if that car matched the description of the car used in the robbery, law enforcement had no reason (upon stopping and searching it) to believe that it was ***the*** black car used in the robbery. Indeed, assuming that Mr. Sturdivant was driving it, they would have realized—because it was being driven by its registered owner—the car either was not stolen after all or had been successfully recovered. To identify and discover incriminating evidence, law enforcement would have either needed to search Mr. Sturdivant's cell phone, which would require a warrant, or his ALPR data, which should require a warrant for all the reasons discussed above.

***Third***, the idea that a stolen vehicle report would have led the police to locate Mr. Sturdivant's car is dubious at best. Somewhere between 600 and

700 cars are stolen ***every month*** in the Cleveland area. *See* Fox 8, Ed Gallek, *Where cars are most likely to be stolen in Cleveland: I-Team*, (updated Mar. 1, 2023, 6:01 a.m. EST), available at https://fox8.com/news/where-cars-are-most-likely-to-be-stolen-in-cleveland-i-team/ (last visited Dec. 18, 2024). Worse still, only around two-thirds of cars are ever recovered and "[t]he vast majority of cases remain unsolved." Cleveland.com, Cliff Pinckard, *Car thefts take dramatic jump in Cleveland in 2023: The Wake Up from Monday, Aug 14, 2023*, available at https://www.cleveland.com/metro/2023/08/car-thefts-take-dramatic-jump-in-cleveland-in-2023-the-wake-up-for-monday-aug-14-2023.html (updated Aug. 14, 2023, 6:13 a.m.). The government has made no effort to show why (absent the ALPR-based identification of Mr. Sturdivant) it is any more likely that his stolen car case would have been solved rather than disappearing into an ever-growing pile of unsolved stolen vehicle reports at the CPD.

The Sixth Circuit has admonished that its "cases usually entail little guesswork because they involve routine practices." *Cooper*, 24 F.4th at 1094. It has also stressed that "[t]he risk of intolerable speculation increases, however, when the government's theory of discovery relies on the irregular actions of third parties." *Id.*

Here, the government's theory is not premised on any sort of "routine practice" and instead turns on a purely speculative theory about what a third party it does not control (the CPD) ***might do*** about one of hundreds of stolen-

vehicle reports it received in a particular month. Whatever else might be said about the crime and clearance rates above, reporting a car stolen in the Cleveland area is no guarantee the car will be located and even less of a guarantee that the thief will be found and the case closed. The government has presented no evidence explaining why the odds of recovery were any greater in this case.

In sum, to suggest that the mere filing of a stolen-vehicle report would lead police to mount a comprehensive search for the vehicle and then, upon locating it, tie it to a robbery based on a vague and generic description of the suspect's vehicle is rank speculation that the law on inevitable discovery does not allow. Consequently, the results of those searches and all the "fruits" of those searches must be suppressed. *See Northrop v. Trippett*, 265 F.3d 372, 383 (6th Cir. 2001) ("[T]he fruit of the poisonous tree doctrine provides that evidence discovered as the indirect result of a Fourth Amendment violation is inadmissible."). In this case, that is all the evidence against Mr. Sturdivant.

**C. The good-faith exception cannot save the officers here.**

The government also argued in the lower court that the good-faith exception protects the evidence it collected against Mr. Sturdivant. That is so, it says because the officers were entitled to rely on the absence of a definitive case precluding them from acting as they did in this case. (Redacted Opposition to Motion to Suppress, R. 98, Page ID # 1901–02.) Not so.

The Supreme Court has held that officers are entitled to rely only on ***binding*** caselaw that supports their actions. *Davis v. United States*, 564 U.S. 229, 240–41 (2011). But "*Davis* does not refer to persuasive or well-reasoned precedent, permit reliance on a growing trend in decisions, or purport to apply to situations in which a plurality, majority, or even an overwhelming majority of circuits agree." *United States v. Ortiz*, 878 F. Supp. 2d 515, 539 (E.D. Pa. 2012); *accord. United States v. Lara*, 815 F.3d 605, 613 (9th Cir. 2016) ("We decline to expand the rule in *Davis* to cases in which the appellate precedent, rather than being binding, is (at best) unclear."); *United States v. Burston*, 806 F.3d 1123, 1129 (8th Cir. 2015) (refusing to apply *Davis* where no binding case specifically authorized a similar search under similar circumstances). "Instead, *Davis* states, repeatedly, that it applies to *binding* precedent" only. *Ortiz*, 878 F. Supp. 2d at 539–40 (emphasis in original).

The good-faith exception, after all, does not give law enforcement "one free pass" to violate the Constitution where there isn't a binding precedent precisely on point. "If a police officer conducts a search based on a non-binding judicial decision . . . he is guessing what the law might be, rather than relying on what a binding legal authority tells him it is." *United States v. Lee*, 862 F. Supp. 2d 560, 569 (E.D. Ky. 2012). And "the *Davis* exception for good faith reliance on controlling precedent does not reach so far as to excuse mistaken efforts to *extend* controlling precedents." *United States v. Jenkins*, 850 F.3d 912, 920 (7th Cir. 2017) (emphasis in original) (internal quotation

marks omitted). If officers decide to take the risk and bet that courts will extend the reach of current decisions, they take the risk that courts upset their expectations—and they do so without the good-faith exception's protection.

To conclude otherwise would contradict the foundational rationale of the good faith doctrine, which protects officers and agents who reasonably rely on some external and apparently conclusive authority that later turns out to be incorrect. Thus, law enforcement are entitled to rely on an apparently valid warrant issued by a neutral magistrate, *United States v. Leon*, 468 U.S. 897, 922 (1984); or on a binding appellate decision issued by neutral court, *Davis*, 564 U.S. at 240–41; or on a statute passed by a duly elected legislature, *Illinois v. Krull*, 480 U.S. 340, 349–50 (1987); or on a database maintained by someone other than the officer, *Arizona v. Evans*, 514 U.S. 1, 15–16 (1995). Only then can it be said that excluding the evidence would penalize law enforcement for someone else's (e.g., a court or legislature's) error. *See Davis*, 564 U.S. at 239–41; *Krull*, 480 U.S. at 349–50.

Here, the government falls short of even meeting its own good-faith test: It presented no evidence (through testimony or otherwise) that the ATF agent who ran the ALPR queries knew about earlier ALPR decisions, let alone relied on them when conducting his investigation. Equally fatal, there was no binding precedent supporting law enforcement's actions. Existing binding third-party doctrine cases did not address ALPR searches. ALPR search cases from other jurisdictions are not binding. And cases like *Carpenter* suggested

the law was moving in another direction. Indeed, courts rejecting challenges to ALPR searches often suggested that such systems might raise Fourth Amendment concerns when—as here—they grow large enough to allow widespread surveillance of citizens' movements. *See, e.g., Commonwealth v. McCarthy*, 142 N.E.3d 1090, 1104 (Mass. 2020). Even the District Court here recognized there had been a "qualitative leap forward" in ALPR technology that put "evidence generated from such technology at risk in absence of a warrant." (Opinion & Order, R. 103, Page ID # 1968.) Thus, the good-faith exception does not apply.

## CONCLUSION

If the District Court's decision stands, it will mean the government has unrestricted access to ALPR databases of travel and location information on nearly every citizen—from Mr. Sturdivant, to people on the way to a protest rally, to the members of this Court. There is no compelling reason to allow the government to construct, maintain, and query such a dragnet, retrospective database of citizens' movements and query it at law enforcement's leisure. The ALPR system at issue here is legally indistinguishable from the facts underlying *Chatrie* and *Carpenter.* The government's inevitable discovery arguments are speculative at best. And the good faith doctrine does not apply.

For all these reasons, the Court should hold that ALPR queries are a search under the Fourth Amendment, vacate Mr. Sturdivant's conviction and

sentence, reverse the District Court's ruling on his motion to suppress, and remand this case for further proceedings consistent with its opinion.

Respectfully submitted,

*/s/ Paul M. Flannery*

Paul M. Flannery (0091480)
Flannery | Georgalis, LLC
1621 Euclid Avenue, Floor 16
Cleveland, Ohio 44115
(216) 702-4463
paul@flannerygeorgalis.com

*/s/ W. Benjamin Reese*

W. Benjamin Reese (0096108)
Flannery | Georgalis, LLC
175 S. 3rd Street, Suite 285
Columbus, Ohio 43215
(216) 200-8530
breese@flannerygeorgalis.com

*Counsel for Lawrence Sturdivant*

## CERTIFICATE OF COMPLIANCE

As required by Federal Rule of Appellate Procedure 32(a)(7)(B)(i), I certify that this brief complies with the type-volume limitations of Rule 32 in that it contains 12,911 words, excluding the sections listed in Rule 32(f). In certifying the number of words in the brief, I have relied on the word count feature of the word-processing software used to prepare the brief.

*/s/ W. Benjamin Reese*
W. Benjamin Reese (0096108)

## CERTIFICATE OF SERVICE

I hereby certify that, on November 2, 2026, a copy of this brief was filed electronically with the Clerk of the Court using the CM/ECF system, which will serve by email counsel of record for all partis. I certify that all participants in the case are registered CM/ECF users.

*/s/ W. Benjamin Reese*
W. Benjamin Reese (0096108)

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Pursuant 6 Cir. R. 28(b), the following filings from the district court's records are designated as particularly relevant to this appeal:

| Description of Entry | Record Entry Nos. | Page ID Range |
|---|---|---|
| Complaint and Affidavit | 1; 1-1 | 1; 2–34 |
| Indictment | 20 | 95–104 |
| Sealed Motion to Suppress<br>Sealed Exhibits<br>Redacted Motion to Suppress | 92;<br>92-1 to 92-18<br>93 | n/a<br><br>1345–1374 |
| Sealed Opposition to Motion to Suppress<br>Sealed Exhibits<br>Redacted Opposition to Motion to Suppress | 98<br>98-1 to 98-5 | n/a<br>1871–1905 |
| Reply in Support of Motion to Suppress | 99 | 1911–25 |
| Letter to Court<br>Exhibits | 102<br>102-1 to 102-2 | 1931–40 |
| Transcript of Suppression Hearing | 151 | 2872–2936 |
| Order Denying Motion to Suppress | 103 | 1941–68 |
| Plea Agreement | 138 | 2774–93 |
| Judgment | 139 | 2805–13 |
| Notice of Appeal | 142 | 2858–59 |
| Transcript of Sentencing | 152 | 2937–3001 |