**No. 26-3426**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA.,
*Plaintiff-Appellee*,
v.
LAWRENCE STURDIVANT,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Ohio
Case No. 1:22-cr-615

# BRIEF OF AMICUS CURIAE NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS IN SUPPORT OF APPELLANT AND REVERSAL

BENTON C. MARTIN
*Sixth Circuit Vice-Chair,*
*Amicus Committee*
*National Association of*
*Criminal Defense Lawyers*
FEDERAL COMMUNITY DEFENDER
613 Abbott Street, Suite 500
Detroit, Michigan 48226
(313) 967-5832
Benton_Martin@fd.org

STEPHANIE F. KESSLER
*Sixth Circuit Vice-Chair,*
*Amicus Committee*
*National Association of*
*Criminal Defense Lawyers*
KESSLER DEFENSE LLC
215 East 9th Street, Suite 650
Cincinnati, Ohio 45202
(513) 316-5807
stephanie@kesslerdefense.com

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

As required by Sixth Circuit Rule 26.1 and Fed. R. App. P. 26(a)(4)(A), undersigned counsel certifies that the National Association of Criminal Defense Lawyers ("NACDL") is neither a subsidiary nor affiliate of a publicly owned corporation and that no publicly owned corporation has a financial interest in the outcome of this appeal.

NACDL represents no parties in this matter. It has no pecuniary interest in its outcome. No party's counsel authored this brief in whole or in part. NACDL is being represented in this matter pro bono. No one contributed money to fund the preparation or submission of this brief.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES........................................................................... iii

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE ............5

INTRODUCTION AND SUMMARY OF ARGUMENT........................................7

ARGUMENT ..........................................................................................9

I. Law enforcement officers across the country have used ALPR systems to arbitrarily invade the privacy of citizens. ..........................................................9

II. The lack of oversight of the use of ALPRs is alarming. ..................................15

CONCLUSION ........................................................................................17

CERTIFICATE OF COMPLIANCE......................................................................19

## TABLE OF AUTHORITIES

### Cases


*Carpenter v. United States*, 585 U.S. 296 (2018) ............................................ 6, 7, 8

*Chatrie v. United States*, 609 U.S. 605 (2026) ............................................... passim

*United States v. Di Re*, 332 U.S. 581 (1948) ..........................................................16


### Other Authorities


Aaliya McFadden, Brandon Schaff & Alex Almanza, *This is Just the Beginning / 5 Current, Former IMPD Officers Charged for Alleged Misuse of Flock License Plate Reader Technology*, WTHR (Sept. 25, 2026) ...........................................11

Affidavit of Probable Cause, State of Indiana v. James Heneghan, Hancock County Superior Court II, Case Number 30D02-2609-F6-001847, filed Sept. 24, 2026.10

Cassandra Schilling, *Florida Deputy Allegedly Used Flock Cameras to Stalk 17-Year-Old Girl, Visiting Her at Work 9 Times*, yahoo!news (Oct. 2, 2026)...........10

Chad Mills, *Pinellas Sheriff Acknowledges Gaps in Flock-style Camera Oversight After Deputy's Arrest*, Tampa Bay 28 (Sept. 30, 2026) .........................................9

Christopher Ingraham, *The IJ Database of ALPR Abuse*, Institute for Justice..........8

Jason Koebler, *Footage Shows Cop Stalking Woman He Met on a TV Set After Surveilling Her With a License Plate Reader*, 404 Media (July 6, 2026)............12

Joe Schroeder, *Indiana Sheriff's Deputy Allegedly Used Flock Cameras to Track Wife, Ex-girlfriend*, Fox59 CBS 4 (Sept. 25, 2026) ............................................10

Roque Planas, *San Jose Officer Fired for Misusing Flock Camera Database in Domestic Abuse Case*, The Guardian (Sept. 13, 2026) .......................................11

Sam Zeff, *Lenexa Police Investigated Author of Column Criticizing the Department. He's 'pissed off'*, KCUR NPR (Feb. 2, 2026)......................... 12, 13

Vincent Martorano, *Pflugerville City Council Denies New Agreement with Flock Safety*, CBS Austin (Aug. 26, 2026)........................................................................15

WECT Staff, *Wrightsville Beach Officer No Longer Employed Over Flock Camera Violation*, 6 WECT (Sept. 8, 2026)........................................................................14

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE

Founded in 1958, the National Association of Criminal Defense Lawyers ("NACDL") is a nonprofit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct. It has a nationwide membership of many thousands of direct members, and up to 40,000 with affiliates. NACDL's members include private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges. NACDL is the only nationwide professional bar association for public defenders and private criminal defense lawyers. NACDL is dedicated to advancing the proper, efficient, and just administration of justice. NACDL files numerous amicus briefs each year in the United States Supreme Court and other federal and state courts, seeking to provide assistance in cases that present issues of broad importance to criminal defendants, criminal defense lawyers, and the criminal justice system as a whole.

NACDL has a particular interest in cases that involve surveillance technologies and programs that pose new challenges to personal privacy. The NACDL Fourth Amendment Center offers training and direct assistance to defense lawyers handling such cases in order to help safeguard privacy rights in the digital age.

All parties have consented to the filing of this brief. No party's counsel authored this brief in whole or in part, and no party, party's counsel, or other person contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The breadth of law enforcement misuse of automatic license plate readers ("ALPRs") illustrates the intrusive nature of the technology. The district court's decision to resolve the issue based on whether ALPRs provide "near perfect surveillance" and track "nearly exactly the movements of its owner" is misguided.

The district court's analysis over emphasized the word "every" from the *Carpenter* decision. In *Carpenter*, the Supreme Court articulated, "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period." *Carpenter v. United States*, 585 U.S. 296, 310 (2018) (quoting *United States v. Jones*, 565 U.S. 400, 430 (2012) (Alito, Ginsburg, Breyer, Kagan, J., concurring)). The word "every" in *Carpenter* should not be interpreted to mean that in the context of location tracking, the Fourth Amendment only offers protection when "every" movement of a person is tracked. The use of the word "every" in *Carpenter* was relevant to distinguishing GPS tracking from traditional physical tracking. A key point in the case was that the technology at issue differed from traditional physical surveillance because the new technology allowed for law enforcement to obtain substantially more information than they could otherwise do and they could obtain that information secretly.

Rather than focus on whether privacy rights are only violated when *every* movement is tracked by law enforcement, courts should instead take a broader view. The *Carpenter* decision was based on more than whether "every" movement of a person was tracked. "The question presented in *Carpenter* was 'whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements.'" *Chatrie v. United States*, 609 U.S. 605, 622 (2026) (citing *Carpenter* 585 U.S. at 300). As recognized in *Chatrie*, the *Carpenter* decision noted,

> What is more, the newfound tracking capacity that CSLI gives the police runs against everyone—not just those under investigation—and travels back in time. Police officers need not decide in advance (as they do with GPS devices) who they want to follow and when. Instead, they can easily and cheaply—with just the click of a button—reconstruct any person's movements retrospectively. What in the past was "unknowable" suddenly becomes open to view, presenting formerly unimaginable privacy concerns.

*Id.* at 624 (citation modified).

As was the case with GPS tracking, ALPRs make tracking a vehicle "remarkably easy, cheap, and efficient compared to traditional investigative tools" *Carpenter*, 585 U.S. at 311. "With just the click of a button, the Government can access each carrier's deep repository of historical location information at practically no expense." *Id.* Cases involving misuse of ALPRs demonstrate how, with the click

of a few buttons, individuals obtained a deep repository of historical location data at practically no expense.

## ARGUMENT

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Id.* at 303. "The 'basic purpose of this Amendment,' our cases have recognized, 'is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Id.* (citation omitted).

ALPRs allow law enforcement to conduct  quick, easy, and cheap searches that detail a comprehensive chronical of a person's past and current movements. As found in *Chatrie*, "A new technology should not transform what individuals had reasonably thought they could withhold from the Government." *Chatrie*, 609 U.S. at 623–24.

### I. Law enforcement officers across the country have used ALPR systems to arbitrarily invade the privacy of citizens.

As of November 8, 2026, the Institute for Justice has tracked 300 instances of ALPR abuse.[1] This brief uses a few specific instances to illustrate the privacy invasions that occurred. The question here is whether these impacted citizens had a reasonable expectation of privacy that was infringed upon by the use of ALPRs or

[1] Christopher Ingraham, *The IJ Database of ALPR Abuse*, Institute for Justice (Nov. 8, 2026 1:27 PM), https://ij.org/the-ij-database-of-alpr-abuse/.

whether because not *every* movement of the vehicles was obtained, the use of the ALPRs in these circumstances is permissible under the Fourth Amendment.

In Pinellas County, Florida, a woman's right to privacy was invaded by a law enforcement officer who wanted to date her.[2] Deputy Karl Gwynne searched the woman's license plate 300 times through an ALPR system between January 2025 and July 2026.[3] "The woman was not under investigation, and investigators found no legitimate law enforcement reason for the searches."[4] The woman had been arrested by Gwynne in 2010. Then, Gwynne reestablished contact and developed an interest in dating her.[5] "Gwynne eventually admitted he had been using the databases because he wanted a relationship with the woman, who had declined his advances."[6] With 300 searches over the course of a year, Gwynne would have been able to deduce patterns in her travel and her location such that he could either arrange to meet her or collect information that he could potentially use against her to achieve his own ends.

Also in Pinellas County, Florida, a child's right to privacy was arbitrarily invaded when a law enforcement officer used ALPR to determine where and when

---

[2] Chad Mills, *Pinellas Sheriff Acknowledges Gaps in Flock-style Camera Oversight After Deputy's Arrest*, Tampa Bay 28 (Sept. 30, 2026), https://perma.cc/34Y4-72XG.
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*

she worked so that he could visit her.[7] He stopped by her high school to locate her vehicle. *Id.* Deputy Travis Stanton used several databases to gather information about the child and her vehicle. *Id.*

In Greenfield Indiana, a law enforcement officer violated the privacy rights of several people including his ex-girlfriends, his wife, and a man his wife knew.[8] Among other things, deputy James Heneghan used ALPRs to track the movement of a person and to confront the person in public spaces.[9] Heneghan ran 6,196 ALPR searches from December 1, 2024, to March 16, 2026.[10] According to a probable cause affidavit, Heneghan searched Flock over 200 times for an ex-girlfriend.[11] The ex-girlfriend reported that she had no in person contact with Heneghan in eleven years.[12]

---

[7] Cassandra Schilling, *Florida Deputy Allegedly Used Flock Cameras to Stalk 17-Year-Old Girl, Visiting Her at Work 9 Times*, yahoo!news (Oct. 2, 2026), https://perma.cc/6GXE-LYV8.

[8] Joe Schroeder*, Indiana Sheriff's Deputy Allegedly Used Flock Cameras to Track Wife, Ex-girlfriend*, Fox59 CBS 4 (Sept. 25, 2026), https://perma.cc/PA4R-BUQD

[9] *Id.*

[10] Affidavit of Probable Cause, State of Indiana v. James Heneghan, Hancock County Superior Court II, Case Number 30D02-2609-F6-001847, filed Sept. 24, 2026.

[11] *Id.*

[12] *Id.*

Several women had their privacy rights violated by Indianapolis Officer Jonathan Schultz.[13] Schultz is alleged to have made 1,396 searches including former and current romantic interests.[14] According to one woman, Schultz appeared at her place of work and then started showing up at her gym and at a school function.[15] Presumably, Schultz used the ALPR to either track the woman in real time or to understand her patterns so that he knew when and where she would be. A separate woman reported that "Schultz seemed to be at the gym at the same time as her and showed up to locations she was at, including Walmart and Smoothie King."[16]

A woman who reported domestic abuse had her rights violated by a San Jose police officer.[17] The woman alleged she was abused by one of the officer's family members.[18] The officer used the ALPR system to share the location of the woman with her alleged abuser.[19]

---

[13] Aaliya McFadden, Brandon Schaff & Alex Almanza, *This is Just the Beginning / 5 Current, Former IMPD Officers Charged for Alleged Misuse of Flock License Plate Reader Technology*, WTHR (Sept. 25, 2026), https://perma.cc/RK46-UHEM.
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] Roque Planas, *San Jose Officer Fired for Misusing Flock Camera Database in Domestic Abuse Case*, The Guardian (Sept. 13, 2026), https://perma.cc/6SUX-WGQS.
[18] *Id.*
[19] *Id.*

A woman had her rights violated in the Florida Keys. Officer Lamar Roman met the woman when he was working a security detail on the set of a TV show.[20] After meeting the woman, the officer found her vehicle information and put her license plate details on a surveillance hotlist.[21] Doing so caused an alert to be sent to him in real time every time she drove past an AI-powered license plate surveillance camera.[22] After finding her real time location, he tracked her down.[23]

On September 30, 2025, Canyen Ashworth wrote an op-ed that "was somewhat critical of Lenexa police."[24] Law enforcement opted to lean toward a criminal investigation into Ashworth.[25] In so doing, law enforcement linked him to some posters that had been displayed a few days earlier.[26] One such poster "showed a federal agent wearing a vest with 'Police ICE' and 'Kidnapping Taskforce' on it and the words 'remember when we killed fascists.'"[27] Law enforcement put a BOLO out noting a suspect had been developed "in the case of the City Center Posters."[28]

---

[20] Jason Koebler, *Footage Shows Cop Stalking Woman He Met on a TV Set After Surveilling Her With a License Plate Reader*, 404 Media (July 6, 2026), https://perma.cc/8AF3-22KC.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] Sam Zeff, *Lenexa Police Investigated Author of Column Criticizing the Department. He's 'pissed off'*, KCUR NPR (Feb. 2, 2026), https://perma.cc/DTJ4-Z424.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*

Along with a photo of the "paper hanger," a photo of Ashworth's car showing the rear license plate was paired with it."[29] The police department then proceeded to track Ashworth's movement by using the city's license plate reader system.[30] Law enforcement commented on Ashworth's habits nothing he "doesn't get out much."[31] Without a search warrant, police were looking for any reason to stop Ashworth.[32] Ashworth stated,

> "I'm a little bit more scared now," he said, "but if anything, I'm also more pissed off because they shouldn't be doing that. And they should know that."[33]

Back to the question asked at the onset, imagine telling these people that what happened to them was not an arbitrary invasion of their privacy because the law enforcement officer involved was not able to track literally *every* movement of their vehicle. In the same way a person has "a legitimate expectation of privacy in in his cell-phone location data," a person has a legitimate expectation of privacy in his location data tracked by ALPRs. *Chatrie*, 609 U.S. at 611. Law enforcement officers conduct a search within the meaning of the Fourth Amendment when they use ALPRs to track the movements of a vehicle. A warrant requirement would have protected these citizens against these arbitrary and unreasonable searches.

---

[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*

## II. The lack of oversight of the use of ALPRs is alarming.

A general lack of oversight leaves us in the dark as to the misuse of ALPRs. As it stands, the information we do have about misuse is limited. As the IJ Database of ALPR Abuse demonstrates, in some if not most instances all we have is a simple statement from a law enforcement entity that there was ALPR misuse. We do not know how it was misused or to what extent. For example, in Wrightsville Beach, North Carolina, an officer was terminated "after an internal audit found the officer misused the department's Flock Safety camera system…"[34] In many of the instances where we have been told something happened, we do not know what happened. We do not know what information was taken and what was done with it. As recognized in *Chatrie*, "[E]ven short-term monitoring of a person's physical movements can provide a wealth of detail about [his] familial, political, professional, religious, and sexual associations." *Chatrie*, 609 U.S. at 628–29 (citation omitted).

> Consider just a few trips that a person is apt to think indisputably private: to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, or the by-the-hour motel."

---

[34] WECT Staff, *Wrightsville Beach Officer No Longer Employed Over Flock Camera Violation*, 6 WECT (Sept. 8, 2026), https://perma.cc/3EYE-FX5B.

*Id.* Like the location history information at issue in *Chatrie*, location history information obtained through an ALPR "enables police officers to focus on precisely those sites—to see [. . .] who shows up." *Id.* "Location History—even two hours of it—allows officers to target one-off events of potential interest: a gun show, say, or a political rally." *Id.*

ALPRs permit law enforcement to secretly obtain substantially more information than they otherwise could. In contrast, law enforcement actions are significantly less secret during traditional physical surveillance. If law enforcement is following someone in a marked vehicle, then the officer's actions are clearly visible. Even where unmarked vehicles are used for physical surveillance, there is still a degree of accountability. An officer presumably would need to account for his time and use of a vehicle to his supervisors. There is a degree of oversight and accountability with traditional physical surveillance that is absent with the use of ALPRs.

The lack of oversight is also problematic given the lack of control over who can access ALPR data. ALPR data is not limited to the specific agency who placed the camera. In Pflugerville, Texas, city leaders learned that 380 unauthorized agencies had access to Pflugerville's Flock system.[35] One council member reported

[35] Vincent Martorano, *Pflugerville City Council Denies New Agreement with Flock Safety*, CBS Austin (Aug. 26, 2026), https://perma.cc/4AU3-TDSY.

that the city had given approval for 80 agencies but that records reflected more than 450 agencies were "tapped in." *Id.* The other agencies were not identified.

A warrant requirement significantly limits who can legally access ALPR data and thereby access a person's travel to places "indisputably private: to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, or the by-the-hour motel." *Chatrie*, 609 U.S. at 628–29.

## CONCLUSION

Although the technology may be new, our nation's founding principles are not. As recognized by the United States Supreme Court in 1948, claims that certain types of searches are necessary for law enforcement purposes do not trump the freedoms enshrined in the Constitution. "We meet in this case, as in many, the appeal to necessity. It is said that if such arrests and searches cannot be made, law enforcement will be more difficult and uncertain." *United States v. Di Re*, 332 U.S. 581, 595 (1948). "But the forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment." *Id.* ALPR use is too permeating. The use of ALPR cameras is a search within the meaning of the Fourth Amendment and warrants should be required.

Respectfully submitted,

STEPHANIE F. KESSLER
*Sixth Circuit Vice-Chair,*
*Amicus Committee*
*National Association of*
*Criminal Defense Lawyers*
KESSLER DEFENSE LLC
215 East 9th Street, Suite 650
Cincinnati, Ohio 45202
(513) 316-5807
stephanie@kesslerdefense.com

BENTON C. MARTIN
*Sixth Circuit Vice-Chair,*
*Amicus Committee*
*National Association of*
*Criminal Defense Lawyers*
FEDERAL COMMUNITY DEFENDER
613 Abbott Street, Suite 500
Detroit, Michigan 48226
(313) 967-5832
Benton_Martin@fd.org

## CERTIFICATE OF COMPLIANCE

This amicus complies with Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 2,685 words.

This amicus brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using 14-point proportionally spaced font.

Respectfully submitted,

STEPHANIE F. KESSLER
*Sixth Circuit Vice-Chair,*
*Amicus Committee*
*National Association of*
*Criminal Defense Lawyers*
KESSLER DEFENSE LLC
215 East 9th Street, Suite 650
Cincinnati, Ohio 45202
(513) 316-5807
stephanie@kesslerdefense.com