No. 26-3426

In The
# United States Court of Appeals for the Sixth Circuit

UNITED STATES,

*Plaintiff-Appellee*,

v.

LAWRENCE STURDIVANT,

*Defendant-Appellant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

**BRIEF OF AMICUS CURIAE THE INSTITUTE FOR JUSTICE IN SUPPORT OF DEFENDANT-APPELLANT ON THE ISSUE ADDRESSED AND IN SUPPORT OF NEITHER AFFIRMANCE NOR REVERSAL**

Michael B. Soyfer
Robert P. Frommer
Eliana Fleischer
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Telephone: (703) 682-9320
msoyfer@ij.org
rfrommer@ij.org
efleischer@ij.org

*Counsel for Amicus Curiae the Institute for Justice*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 26-3426 Case Name: USA v. Lawrence Sturdivant

Name of counsel: Michael B. Soyfer, Robert P. Frommer, Eliana Fleischer

Pursuant to 6th Cir. R. 26.1, Amicus Curiae Institute for Justice
*Name of Party*
makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on November 9, 2026 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Michael B. Soyfer

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

## TABLE OF CONTENTS


**PAGE(S)**

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST ..... ii

TABLE OF AUTHORITIES ..... iv

INTEREST OF AMICUS CURIAE ..... 1

SUMMARY OF ARGUMENT ..... 2

ARGUMENT ..... 4

I. The use of a vast network of ALPRs to collect data on drivers' movements is a search ..... 4

A. *Carpenter* and *Chatrie* measure the capabilities of surveillance technologies against Founding-era privacy expectations ..... 5

B. Extensive ALPR systems transcend traditional expectations of police surveillance capacity and thereby effect a search ..... 11

II. ALPRs effect an unreasonable search within the original meaning of the Fourth Amendment ..... 19

A. ALPR surveillance is purposeful investigative conduct that would have qualified as a "search" at the Founding ..... 19

B. Suspicionless surveillance of every driver using ALPRs is an unreasonable search ..... 23

CONCLUSION ..... 28

CERTIFICATE OF COMPLIANCE ..... 30

## Table of Authorities

**Page(s)**

### Cases


*Almeida-Sanchez v. United States*,
413 U.S. 266 (1973) .......... 25

*Berger v. New York*,
388 U.S. 41 (1967) .......... 26

*Biden v. Nebraska*,
600 U.S. 477 (2023) .......... 7

*Bourgeois v. Peters*,
387 F.3d 1303 (11th Cir. 2004) .......... 26

*Boyd v. United States*,
116 U.S. 616 (1886) .......... 5, 22, 24

*Carpenter v. United States*,
585 U.S. 296 (2018) .......... 4-9, 12-18, 27

*Chatrie v. United States*,
609 U.S. 605 (2026) .......... 1, 4-10, 12-14, 16, 18-19, 27

*Delaware v. Prouse*,
440 U.S. 648 (1979) .......... 7

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......... 19

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) .......... 21

*Entick v. Carrington*,
19 How. St. Tr. 1029 (C.P. 1765) .......... 21, 25

*Kansas v. Glover*,
589 U.S. 376 (2020) .......... 15

*Kyllo v. United States*,
533 U.S. 27 (2001) .......... 5, 9, 10, 16, 20

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
2 F.4th 330 (4th Cir. 2021) .......... 8, 12, 16

*Morgan v. Fairfield County*,
903 F.3d 553 (6th Cir. 2018) .......... 19, 20

*Punxsutawney Hunting Club v. Pa. Game Comm'n*,
360 A.3d 828 (Pa. 2026) .......... 1

*Riley v. California*,
573 U.S. 373 (2014) .......... 24

*Schmidt v. City of Norfolk*,
2025 WL 410080 (E.D. Va. Feb. 5, 2025) .......... 1

*Snitko v. United States,*
90 F.4th 1250 (9th Cir. 2024) .......... 1

*Tan v. City of San Jose*,
No. 5:26-cv-03181 (N.D. Cal. Apr. 15, 2026) .......... 1

*United States v. Carpenter*,
819 F.3d 880 (6th Cir. 2016) .......... 7

*United States v. Cortez*,
449 U.S. 411 (1981) .......... 17

*United States v. Di Re*,
332 U.S. 581 (1948) .......... 5

*United States v. Green*,
149 F.4th 733 (D.C. Cir. 2025) .......... 8

*United States v. Jones*,
565 U.S. 400 (2012) .......... 6, 7, 14, 16

*United States v. Moalin*,
973 F.3d 977 (9th Cir. 2020) .......................................................................12

*United States v. Rahimi*,
602 U.S. 680 (2025) ...................................................................................24

*United States v. Rohrig*,
98 F.3d 1506 (6th Cir. 1996) .......................................................................24

*United States v. Smith*,
110 F.4th 817 (5th Cir. 2024) ........................................................................9

*United States v. Sturdivant*,
786 F. Supp. 3d 1098 (N.D. Ohio 2025) ................................10-12, 14-15, 17, 23

*United States v. U.S. Dist. Ct.*,
407 U.S. 297 (1972) ...................................................................................24

**Constitutional Provisions**

U.S. Const. amend. IV .......................................... 1, 3, 5, 6, 8-10, 16, 21-22, 24-28

**Other Authorities**

*A Guide to Benchmarking Fixed LPR Solutions*, Flock Safety,
https://tinyurl.com/425xm5xs (last visited Nov. 6, 2026) ..................................15

*Adams' "Abstract of the Argument": Ca. April 1761*, Founders Online,
https://tinyurl.com/5d93dhn6 (last visited Nov. 6, 2026) ............................ 24, 26

*Always Watching: Flock's Nationwide AI Surveillance Network: Hearing Before the Subcomm. on Crime & Counterterrorism of the S. Comm. on the Judiciary*, 119th Cong. (2026),
https://tinyurl.com/bdzkmham .......................................................................2

Brief for the United States, *Carpenter v. United States*, No. 16-402 ......................18

Christopher Ingraham,
*The IJ Database of ALPR Abuse*, Inst. for Just. (Aug. 12, 2026),
https://ij.org/the-ij-database-of-alpr-abuse/.......................................................27

*Compare Flock vs Axon*, Flock Safety,
https://tinyurl.com/jucurk4e (last visited Nov. 6, 2026) .....................................11

Devlin Barrett,
*Gun-Show Customers' License Plates Come Under Scrutiny*,
Wall St. J. (Oct. 2, 2016),
https://tinyurl.com/yuhd3tde ........................................................................13

Dhruv Mehrotra & Dell Cameron,
*Flock Has a Powerful New AI Tool for Police.*
*We Got Its Code*, Wired (Aug. 19, 2026),
https://tinyurl.com/4ndcvvaz.........................................................................15

*Healthcare*, Flock Safety,
https://tinyurl.com/4me4f6zm (last visited Nov. 6, 2026) ..................................13

*How AI Video Search Helps Law Enforcement Find Leads Faster*,
Flock Safety,
https://tinyurl.com/25hb8c92 (last visited Nov. 6, 2026) ..................................15

James Parker,
*Conductor Generalis* (1764),
https://tinyurl.com/5ypzjy3b .........................................................................20

Jason Koebler,
*Flock Taught Cops How to Surveil No Kings Protesters*,
404 Media (Sept. 3, 2026),
https://tinyurl.com/42mu6puk.........................................................................13

Jed Rubenfeld,
*The End of Privacy*,
61 Stan. L. Rev. 101 (2008) ..................................................................... 25, 26

John Wrench,
*The Original Meaning of "Searches,"*
29 U. Pa. J. Const. L. (forthcoming 2027),
https://tinyurl.com/yc23x5hr.........................................................................20

Kunle Falayi,
*As Flock Surveillance Spreads, Virginia Communities Push Back*,
Va. Ctr. for Investigative Journalism (Aug. 31, 2026),
https://tinyurl.com/y9ydjejz ........................................................................11

Laura K. Donohue,
*Bulk Metadata Collection: Statutory and Constitutional Considerations*,
37 Harv. J.L. & Pub. Pol'y 757 (2014) ...............................................................10

Laura K. Donohue,
*The Original Fourth Amendment*,
83 U. Chi. L. Rev. 1181 (2016)............................................................ 21, 23, 26

Luke M. Milligan,
*The Forgotten Right to Be Secure*,
65 Hastings L.J. 713 (2014) .........................................................................25

Michael Doudna,
*Flock Cameras Are Everywhere*, WSB-TV Atlanta (Sept. 24, 2026),
https://tinyurl.com/efj6ru2t ........................................................................11

Morgan Cloud,
*Property Is Privacy: Locke and Brandeis in the Twenty-First Century*,
55 Am. Crim. L. Rev. 37 (2018) ...................................................................22

Noah Webster,
*An American Dictionary of the English Language* (1828),
https://tinyurl.com/mvke2jsb ......................................................................20

NorfolkTV,
*Norfolk City Council Work Session* (YouTube, May 23, 2023),
https://tinyurl.com/5cvnj34a .......................................................................17

*Places of Worship*, Flock Safety,
https://tinyurl.com/yc68r86e (last visited Nov. 6, 2026) ....................................13

Richard M. Re,
*The Positive Law Floor*, 129 Harv. L. Rev. F. 313 (2016).................................22

Samuel Johnson,
*Dictionary of the English Language* (4th ed. 1773),
https://tinyurl.com/2v2pba6d ........................................................................20

*Terms and Conditions*,
Flock Safety (last updated Aug. 21, 2026),
https://tinyurl.com/52myxzfz ........................................................................22

*The Plate Privacy Project*,
Inst. for Just.,
https://plateprivacy.com/ ..............................................................................1

Thomas K. Clancy,
*The Role of Individualized Suspicion in Assessing the Reasonableness of Searches and Seizures*, 25 U. Mem. L. Rev. 483 (1995).....................................24

Thomas Y. Davies,
*Recovering the Original Fourth Amendment*,
98 Mich. L. Rev. 547 (1999) ...................................................................... 21, 23

Thomas Y. Davies,
*The Fictional Character of Law-and-Order Originalism*,
37 Wake Forest L. Rev. 239 (2002) ...................................................................27

Thomas Erskine May,
*The Constitutional History of England Since the Accession of George Third, 1760-1860* (N.Y., W.J. Widdleton 1874),
https://tinyurl.com/bdfsh32p .........................................................................28

Tracey Maclin,
*Informants and the Fourth Amendment: A Reconsideration*,
74 Wash. U. L.Q. 573 (1996) .........................................................................23

U.S. Dep't of Transp., Fed. Highway Admin.,
*Highway Statistics*, tbl. DL-1C (Feb. 2026),
https://tinyurl.com/2s52u97k .........................................................................11

U.S. Trademark Application Serial No. 97026096 (filed Sept. 14, 2021),
https://tinyurl.com/m28mk963 .......................................................................18

*Virginia State Police Recorded License Plates of Inauguration Attendees: Report*, NBC4 Wash. (Oct. 20, 2013), https://tinyurl.com/3bvrt5v3 ....................13

Wesley MacNeil Oliver, *The Neglected History of Criminal Procedure, 1850-1940*, 62 Rutgers L. Rev. 447 (2010) ....................27

## INTEREST OF AMICUS CURIAE

The Institute for Justice is a nonprofit, public-interest law firm committed to defending the essential foundations of a free society by securing greater protection for individual liberty. A central pillar of this mission is advocacy for the rule of law. Consistent with its view that the Fourth Amendment is a fundamental limit on government power, the Institute for Justice has sought through litigation to protect innocent people from unconstitutional searches. *E.g.*, *Snitko v. United States,* 90 F.4th 1250 (9th Cir. 2024); *Punxsutawney Hunting Club v. Pa. Game Comm'n*, 360 A.3d 828 (Pa. 2026). The Institute for Justice also regularly submits amicus briefs in Fourth Amendment cases. *E.g.*, Br. of the Inst. for Just. as Amicus Curiae, *Chatrie v. United States*, 609 U.S. 605 (2026) (No. 25-112), 2026 WL 624583.

Relevant here, the Institute for Justice has unique experience litigating cases challenging the use of automated license plate reader ("**ALPR**") cameras. It is litigating the first such civil case that advanced through discovery, *see Schmidt v. City of Norfolk*, 2025 WL 410080, at *1 (E.D. Va. Feb. 5, 2025), and has since filed a second lawsuit challenging a network of nearly 500 ALPRs in San Jose, California, *see* Compl., *Tan v. City of San Jose*, No. 5:26-cv-03181 (N.D. Cal. Apr. 15, 2026), https://tinyurl.com/2hptafma. Beyond litigation, the Institute for Justice launched the Plate Privacy Project, a campaign to bring awareness to how ALPR surveillance impacts everyday people. *See The Plate Privacy Project*, Inst. for Just.,

https://plateprivacy.com/. As part of this campaign, an Institute for Justice representative testified at a Senate Judiciary Committee hearing. *Always Watching: Flock's Nationwide AI Surveillance Network: Hearing Before the Subcomm. on Crime & Counterterrorism of the S. Comm. on the Judiciary*, 119th Cong. (2026), https://tinyurl.com/bdzkmham.[1]

## SUMMARY OF ARGUMENT

ALPRs are the most pervasive form of police surveillance ordinary people face today. Every month, just one of the two ALPR networks police used here amasses more than 20 billion datapoints, reflecting the movements of ordinary people on their way to loved ones, places of worship, healthcare appointments, protests, gun shows, immigration lawyers' offices, and countless other places. Yet the district court held that this was not a Fourth Amendment search simply because police could find only 26 photographs of the defendant's car. Despite the thoughtfulness of the district court's opinion, that fundamental error led it to the wrong conclusion—one that leaves countless law-abiding people at the mercy of a growing, AI-enhanced dragnet.

The Institute for Justice is filing this brief to make two points.

[1] All parties consented to the filing of this brief. No party or its counsel authored this brief in whole or in part, or contributed money intended to fund preparing or submitting this brief. No person—other than the Institute for Justice, its members, or its counsel—contributed money intended to fund preparing or submitting this brief.

***First***, the district court framed the question too narrowly. Whether the use of a technology to track people's movements amounts to a search depends not on what the technology uncovered about one defendant but on its general capabilities. Vast ALPR systems (like the ones in this case) share the relevant capabilities of the technologies that the Supreme Court has held effect a search. They collect massive quantities of data that can reveal patterns in people's movements and visits to sensitive locations. They are far cheaper, easier to use, and more efficient than traditional police surveillance. And they let police travel back in time to reconstruct people's movements, even when police had no reason to suspect their target in advance. In all these ways, ALPRs transcend traditional expectations of police surveillance capacity, which means their use is a search.

***Second***, returning to the Fourth Amendment's original meaning would make this conclusion even more obvious. "Search" was not a term of art at the Founding. Instead, it meant purposeful, investigative conduct. Because the sole purpose of the ALPR systems is the investigation of crime, their use is a search. And it is an "unreasonable" one. As used in the Fourth Amendment, "unreasonable" means "against the reason of the common law." The rapidly developing search-and-seizure common law of the Framers' time had condemned general warrants as the paradigmatic abuse because they undermined the people's security by subjecting everyone to the potential for arbitrary searches. The ALPR systems police used here

are even worse: they effect a never-ending search of everyone who drives past, collecting troves of data on people's movements in a government database that officers can mine without individualized suspicion.

Whichever approach it chooses, this Court should hold that the use of an ALPR dragnet to surveil drivers without suspicion is an unreasonable search. The Institute for Justice takes no position, however, on the appropriate remedy (if any) for that Fourth Amendment violation.

## ARGUMENT

### I. The use of a vast network of ALPRs to collect data on drivers' movements is a search.

The central question in this case is whether the use of ALPRs was a "search" under *Carpenter v. United States*, 585 U.S. 296 (2018), and *Chatrie v. United States*, 609 U.S. 605 (2026). No doubt, the Court will be inundated with exegeses of those cases from the parties and their amici. Rather than repeat that discussion, this amicus brief concentrates on two key points arising from those cases. *First*, rather than focus on whether ALPRs surmount some undefined "whole" of people's movements threshold, this Court should understand *Carpenter* and *Chatrie* as creating a test to distinguish conventional police surveillance from unconventional dragnet technologies. And *second*, the Court should apply that test to the overall capabilities of the extensive ALPR network at issue rather than focusing solely on what it revealed about Sturdivant's movements. Viewed through that lens, this extensive

surveillance network is a search: it transcends traditional expectations of police surveillance capacity by enabling officers to easily reconstruct people's past movements without judicial oversight.

### A. *Carpenter* and *Chatrie* measure the capabilities of surveillance technologies against Founding-era privacy expectations.

"[T]he advance of technology" threatens "to shrink the realm of guaranteed privacy" under the Fourth Amendment. *Kyllo v. United States*, 533 U.S. 27, 34 (2001). "[T]o guard against the … risk of undue encroachment," the Supreme Court has emphasized "that the Fourth Amendment must protect against every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed." *Chatrie*, 609 U.S. at 641 (cleaned up). The legitimacy of such privacy expectations depends not on "any fixed set of rules," but on "'guideposts' stretching back to the Fourth Amendment's beginnings." *Id.* at 621. From its earliest Fourth Amendment cases, the Supreme Court "has sought to secure the 'privacies of life' against the exercise of 'arbitrary power'" and "place obstacles in the way of a too permeating police surveillance." *Id.* (first quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886); then quoting *United States v. Di Re*, 332 U.S. 581, 595 (1948)). "[T]he challenge of adhering to those principles in the face of new technologies" has led the Court to frame the search inquiry around the "degree of privacy against government that existed when the Fourth Amendment was adopted." *Id.* at 621-22 (citation omitted).

Modern-day surveillance technologies take many forms and collect many types of information. In *Carpenter* and *Chatrie*, the Court explained how to assess one category of surveillance tools—those that track people's physical movements.

The starting point for these cases was *United States v. Jones*, 565 U.S. 400 (2012), which held that GPS tracking of a car's public movements was a search. The holding was unanimous, but the justices split evenly on the rationale. "[F]ive Justices decided the case … based on the Government's physical trespass of the vehicle." *Chatrie*, 609 U.S. at 623 n.6. An "overlapping" set of "five Justices [also] agreed that such tracking counts as a Fourth Amendment search" because it invades a reasonable expectation of privacy. *Id.* at 623 & n.6. Four reasoned "society's expectation has been that" the government "would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period." *Jones*, 565 U.S. at 430 (Alito, J., concurring). Justice Sotomayor, meanwhile, explained in her concurrence that "even short-term monitoring" can "reveal private aspects of identity," invite "abuse," and "chill[] associational and expressive freedoms." *Id.* at 415-16.

The upshot, *Carpenter* later explained, is that "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere." 585 U.S. at 310. Decades of precedent, after all, had repeatedly affirmed that "people are not shorn of all Fourth Amendment protection when they step from their homes onto the

public sidewalks" and "into their automobiles." *Delaware v. Prouse*, 440 U.S. 648, 663 (1979); *see Chatrie*, 609 U.S. at 623 (*Jones* "made sense, the *Carpenter* Court thought, even though the movements occurred in public"). From there, it followed that acquiring cell-site location information ("**CSLI**")—at least multiple days' worth—"contravenes" a reasonable expectation of privacy. *See Carpenter*, 585 U.S. at 310 n.3, 311. That was so even though CSLI is imprecise and sporadic.[2] *Compare id.* at 312, *with id.* at 336 (Kennedy, J., dissenting). The "Court ha[d] already rejected the proposition that 'inference insulates a search,'" and thus deemed it sufficient that police "could, in combination with other information, deduce a detailed log of [a person's] movements." *Id.* at 312 (maj. op.) (citation omitted). Indeed, despite those shortcomings and much "like GPS monitoring," CSLI "is remarkably easy, cheap, and efficient compared to traditional investigative tools." *Id.* at 311.

Two other factors, though, prompted the Supreme Court to conclude that CSLI posed "even greater privacy concerns than" GPS. *See id.* at 311-12. Unlike a GPS on a car, cellphones can accompany people into private buildings.[3] *Id.* And "the

[2] As this Court noted in the opinion *Carpenter* reversed, CSLI can be "12,500 times less accurate than … GPS"; a sector "might encompass bridal stores and Bass Pro Shops, gay bars and straight ones, a Methodist church and the local mosque." *United States v. Carpenter*, 819 F.3d 880, 889 (6th Cir. 2016).

[3] Although this capability provided an additional rationale for *Carpenter*'s holding, the Supreme Court neither deemed it necessary nor held that public surveillance could not be a Fourth Amendment search. *Cf. Biden v. Nebraska*, 600 U.S. 477, 506 n.9 (2023) (noting the "Court's familiar practice of providing multiple

retrospective quality of the data … gives police access to a category of information otherwise unknowable." *Id.* at 312. Wireless carriers "continually log[ location information] for all" cellphones, which means that "police need not even know in advance whether they want to follow a particular individual, or when." *Id.* Because "this tireless and absolute surveillance" "runs against everyone," the Supreme Court was loath to license suspicionless mass surveillance by allowing police to acquire CSLI "without regard to the constraints of the Fourth Amendment." *See id.*

*Chatrie*, in turn, addressed two issues that *Carpenter* left open. "The Government[ did] not much contest[]" that "[e]verything *Carpenter* relied on … applies as well or better to the police's accessing of Google's Location History data." *Chatrie*, 609 U.S. at 625, 627. Instead, the government argued that the small slice of data it acquired could not reveal intimate details and those data did not reveal any private information about the *defendant*. *Id.* at 627-28, 631-32. But the Supreme Court rejected the government's "grace-period approach," which would invite "a host of line-drawing questions." *Id.* at 630 n.9. To be sure, the Court conceded that short-term monitoring may not reveal "[r]epeated patterns … that individuals wish to, and reasonably expect to, keep to themselves." *Id.* at 629. Still, "[e]ven short-

---

grounds to support its conclusions"). Since *Carpenter*, other circuits have recognized that public surveillance can sometimes be a search. *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 341 (4th Cir. 2021) (en banc); *accord United States v. Green*, 149 F.4th 733, 746-48 (D.C. Cir. 2025).

term monitoring" could reveal visits to sensitive locations, like healthcare facilities, places of worship, gun shows, and political rallies. *Id.* at 629, 630 n.10. That the defendant did not go to those places during the geofence period was irrelevant. *See id.* at 630-32. "The surveillance must be either a search or not," and the answer does not turn on whether a particular use of a surveillance technology is "likely to[] detect 'private activities' or 'intimate details.'" *See id.* at 629, 632 (citation omitted).[4] Instead, courts must assess the *ultimate potential* of a surveillance technology to reveal private details based on its overall *capabilities*. *See United States v. Smith*, 110 F.4th 817, 834 n.8 (5th Cir. 2024).

*Carpenter* and *Chatrie*, in short, establish four points that should guide resolution of this case:

- The use of technology to pervasively surveil people's public movements is a Fourth Amendment search.
- The key consideration is whether the technology contravenes traditional expectations of police surveillance capacity because it enables police to cheaply and easily reconstruct people's past

[4] Similarly, *Kyllo* found a search because the thermal imager had the *potential* to reveal when "the lady of the house takes her daily sauna and bath," even though that was unlikely when police briefly scanned the suspect's house at 3:20 a.m. *See* 533 U.S. at 29-31, 38.

movements, even if they had no reason to suspect their target in advance.

- Technologies that produce incomplete data can still effect searches if they enable police to deduce a detailed log of people's movements in combination with other information.
- Whether use of a given surveillance technology is a search does not depend on the quantity of information police obtain using that technology, but on the technology's ultimate capabilities.

The district court's opinion is consistent with many of these points. But it veered off course by evaluating only "the fruits of a given surveillance," *Chatrie*, 609 U.S. at 632, rather than the general capabilities of the technology. Focusing on those capabilities, the next section explains why the ALPR systems effected a search.[5]

[5] This Court need not resolve whether the collection or querying of data is the search. *See United States v. Sturdivant*, 786 F. Supp. 3d 1098, 1111 (N.D. Ohio 2025). If it does, it should hold that collection is the search. *Kyllo* rejected the argument that a search happens only when police analyze the results of their surveillance and infer intimate details. *See* 533 U.S. at 36-37 & n.4. To hold otherwise would create an automation exception to the Fourth Amendment. *See* Laura K. Donohue, *Bulk Metadata Collection: Statutory and Constitutional Considerations*, 37 Harv. J.L. & Pub. Pol'y 757, 895 (2014). Under that rationale, the government could require all home-security cameras to upload video to a government database, provided police got a warrant before watching any footage. That is especially untenable now that AI has automated not only the collection but also the analysis of surveillance data. *See* Section I(B) below.

### B. Extensive ALPR systems transcend traditional expectations of police surveillance capacity and thereby effect a search.

Vast ALPR systems, like the ones police used here, have the capacity to collect and store enormous troves of data on people's movements. Across greater Cleveland, the district court found there were nearly 3,000 ALPRs (combining Flock and ELSAG).[6] *See Sturdivant*, 786 F. Supp. 3d at 1103-04. Flock boasts that its network amasses ***over 20 billion datapoints every month*** in a nation with around 200 million registered drivers. *Compare Flock vs Axon*, Flock Safety, https://tinyurl.com/jucurk4e (last visited Nov. 6, 2026), *with* U.S. Dep't of Transp., Fed. Highway Admin., *Highway Statistics*, tbl. DL-1C (Feb. 2026), https://tinyurl.com/2s52u97k. This generates astonishing amounts of data about people. For instance, one woman discovered through a public records request that her city's system of 175 ALPRs had tracked her "***more than 100 times***" in "***just three days***." Kunle Falayi, *As Flock Surveillance Spreads, Virginia Communities Push Back*, Va. Ctr. for Investigative Journalism (Aug. 31, 2026), https://tinyurl.com/y9ydjejz (emphasis added). Given the ever-increasing density of ALPRs, avoiding them "can be next to impossible." *See* Michael Doudna, *Flock Cameras Are Everywhere*, WSB-TV Atlanta (Sep. 24, 2026), https://tinyurl.com/efj6ru2t ("A typical 15-minute commute was projected to pass roughly 30 cameras.").

---

[6] The parties stipulated "there was no legally significant difference" between these systems. *Sturdivant*, 786 F. Supp. 3d at 1103.

This "inescapable and automatic" surveillance, *Carpenter*, 585 U.S. at 320, can reveal "the most closely kept aspects of [people's] lives," *Chatrie*, 609 U.S. at 621. Because ALPR databases typically preserve data for 30 days, *see Sturdivant*, 786 F. Supp. 3d at 1103, police can use them to deduce otherwise obscure patterns and past visits to sensitive locations.

Start with patterns. Because "people's movements are so unique and habitual," "identity is easy to deduce from just a few random points of an individual's movements" and the "insight provided by [locational] data into individuals' private lives is profound." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 343-44 & n.11 (4th Cir. 2021) (en banc) (alteration in original) (citation omitted). With unfettered access to weeks of location data from ALPRs, officers can make "deductions about 'what a person does repeatedly, what he does not do, and what he does ensemble,' which 'reveal[s] more about a person than does any individual trip viewed in isolation.'" *Id.* at 342 (citation omitted). For instance, they could mine the data for people who were once routinely spotted near a church during AA meetings but now are spotted around bars during that timeframe. Or a married person whose last sighting of the day is now near a hotel, rather than their home. Moreover, the collection of data about potentially "millions of other people[]" can "make[] the collection of [any person's] *own* []data considerably more revealing." *United States v. Moalin*, 973 F.3d 977, 992 (9th Cir. 2020). Officers could, for example, identify

people repeatedly spotted around the same cameras at around the same time. *Cf. Carpenter*, 585 U.S. at 311 (location information can reveal "familial, political, professional, religious, and sexual associations" (citation omitted)).

"[R]epeated patterns," however, "are not all that individuals wish to, and reasonably expect to, keep to themselves." *Chatrie*, 609 U.S. at 628-29. ALPRs can also capture visits to sensitive locations. *See id.* Nationwide, officers have used ALPRs to track attendees at "protest march[es],"[7] "gun show[s],"[8] and "political rall[ies]."[9] *Cf. Chatrie*, 609 U.S. at 626, 629. Not to mention, Flock markets to places of worship[10] and healthcare facilities,[11] which often share data with police. Unlike a GPS that requires a pre-identified suspect, ALPRs "enable[] police officers to focus on precisely those sites—to see, in a given time block, who shows up." *Id.* at 629. And although ALPRs do not literally follow people into buildings, the "insight[]"

---

[7] *See* Jason Koebler, *Flock Taught Cops How to Surveil No Kings Protesters*, 404 Media (Sep. 3, 2026), https://tinyurl.com/42mu6puk.

[8] Devlin Barrett, *Gun-Show Customers' License Plates Come Under Scrutiny*, Wall St. J. (Oct. 2, 2016), https://tinyurl.com/yuhd3tde.

[9] *Virginia State Police Recorded License Plates of Inauguration Attendees: Report*, NBC4 Wash. (Oct. 20, 2013), https://tinyurl.com/3bvrt5v3.

[10] *Places of Worship*, Flock Safety (last visited Nov. 6, 2026), https://tinyurl.com/yc68r86e.

[11] *Healthcare*, Flock Safety (last visited Nov. 6, 2026), https://tinyurl.com/4me4f6zm.

that "[e]ven short-term monitoring" can reveal "indisputably private" trips came from *Jones*, where "the movements occurred in public." *Id.* at 623, 629.

Whether police surfaced Sturdivant's hidden patterns or spotted him at sensitive locations is immaterial because only the capabilities of the surveillance system matter. After all, the defendant in *Chatrie* was captured only while robbing a bank and fleeing. *See* 609 U.S. at 617, 632. But "[w]hether something is a search does not depend on what it finds." *Id.* at 632. The district court got it backwards. It found that "law enforcement could use ALPR more invasively to uncover a target's personal habits or other intimate details," but it discounted those capabilities because the "surveillance [did not] supply [an] 'intimate window' into Mr. Sturdivant's personal life." *Sturdivant*, 786 F. Supp. 3d at 1112-13. *Chatrie* makes clear that the district court should have based its holding on the ALPR systems' capabilities, not on what they happened to "turn[] up" about Sturdivant. 609 U.S. at 632. His ability to evade surveillance in a car with hard-to-read temporary tags should not blind the Court to the capabilities of 3,000 ALPRs to collect troves of data about countless law-abiding people.

Moreover, ALPR surveillance "is remarkably easy, cheap, and efficient compared to traditional investigative tools." *Carpenter*, 585 U.S. at 311. Investigators need not spend hours piecing together pictures and clues. Instead, ALPRs photograph every passing car and use AI to convert the photographs into

data. *See A Guide to Benchmarking Fixed LPR Solutions*, Flock Safety, https://tinyurl.com/425xm5xs (last visited Nov. 6, 2026). "With just the click of a button," *Carpenter*, 585 U.S. at 311, police can pull up a detailed log of a person's movements using a government-issued identifier (a license plate number), *cf. Kansas v. Glover*, 589 U.S. 376, 381 (2020) (endorsing "the commonsense inference" that the registered owner is "likely the driver of the vehicle"). Even without a plate number, they can describe a car and have AI search for it. *See How AI Video Search Helps Law Enforcement Find Leads Faster*, Flock Safety, https://tinyurl.com/25hb8c92 (last visited Nov. 6, 2026). AI is speeding up not only the *retrieval* of this information but the *analysis* too. Flock's "artificial intelligence tool for police … can identify drivers and track vehicles by their patterns of movement alone." Dhruv Mehrotra & Dell Cameron, *Flock Has a Powerful New AI Tool for Police. We Got Its Code*, Wired (Aug. 19, 2026), https://tinyurl.com/4ndcvvaz. Among the "prompts" Flock pre-loaded into this tool was one that "takes a single plate and asks the system ***to plot the journeys of that car and its 'top three associates.'***" *Id.* (emphasis added).

ALPRs also share the "retrospective quality" *Carpenter* found so troubling. The retention periods here range from "thirty days" to "one year." *Sturdivant*, 786 F. Supp. 3d at 1103-04. That lets police "travel back in time to retrace a person's whereabouts," *Carpenter*, 585 U.S. at 312, something "law enforcement officials of

an earlier age" could not do, *see Chatrie*, 609 U.S. at 626. "Unlike with the GPS device in *Jones*," "this newfound tracking capacity runs against everyone," so "police need not even know in advance whether they want to follow a particular individual, or when." *Carpenter*, 585 U.S. at 312. Indeed, ALPRs pose an even greater threat to Fourth Amendment rights. *Carpenter* and *Chatrie* involved third-party business records the government wanted to repurpose for law enforcement. *See Chatrie*, 609 U.S. at 612-13, 622-23; *Carpenter*, 585 U.S. at 300. In each case, the government had to get a court order or warrant. *See Chatrie*, 609 U.S. at 614-18; *Carpenter*, 585 U.S. at 317. ALPRs, by contrast, are an indiscriminate police surveillance tool *by design*. Cutting out the middleman lets police "call upon the results of th[eir] surveillance without" judicial oversight. *Carpenter*, 585 U.S. at 312; *see Beautiful Struggle*, 2 F.4th at 346-47.

To be sure, ALPRs do not shadow a driver all the way to their destination. Inferring a person's destination from ALPR data, however, is no different from inferring where a person went in a miles-wide area between sporadic tower pings or after parking a car with a GPS attached. *See Beautiful Struggle*, 2 F.4th at 342-43. Virtually no surveillance technology yields a perfect "8-by-10 Kodak glossy that needs no analysis (*i.e.*, the making of inferences)." *Kyllo*, 533 U.S. at 36. In *Kyllo*, police combined inferences from thermal images with other information to obtain a warrant for a home search. *See id.* at 29-30. Likewise, police could "deduce a

detailed log of Carpenter's movements" from imprecise and sporadic CSLI only "*in combination with other information*." *Carpenter*, 585 U.S. at 312 (emphasis added). To hold that gaps in ALPR data put ALPRs beyond the ambit of the Fourth Amendment would allow inference to insulate a search. *See id.*

Indeed, as the district court found, ALPR "data can be more granular than" CSLI. *Sturdivant*, 786 F. Supp. 3d at 1113. Not only are ALPR data more precise, but they provide more context, too. *See id.* Police know that the person is driving and which direction they are heading. Following a pattern of captures, they can reconstruct a person's route and infer where they stopped, especially in cities with dense ALPR networks.[12] "From these data, a trained officer" can "draw[] inferences and make[] deductions … that might well elude an untrained person." *See United States v. Cortez*, 449 U.S. 411, 418 (1981). Flock itself advises clients that ALPRs can geofence a neighborhood, making the process of deducing movements from ALPR data no more speculative than doing so with CSLI:

---

[12] *Cf., e.g.*, NorfolkTV, Norfolk City Council Work Session, at 21:21-43 (YouTube, May 23, 2023), https://tinyurl.com/5cvnj34a (police chief telling city council, "It would be difficult to drive anywhere of any distance without running into a camera somewhere.").







*Compare* Br. for the United States at 26 (fig. 2), *Carpenter*, 585 U.S. 296 (No. 16-402) (left, government's demonstrative showing pings around time of robbery), *with* U.S. Trademark Application Serial No. 97026096 at p. 34 (of 72) (filed Sep. 14, 2021), https://tinyurl.com/m28mk963 (right, excerpt from Flock trademark application).

* * *

This pervasive surveillance may not have captured much about Sturdivant's movements. But the Court should not miss the forest for the trees. Vast ALPR networks capture enormous amounts of data on the movements of law-abiding people going about their otherwise private routines. Under *Carpenter* and *Chatrie*,

this "virtual panopticon" is an unlawful warrantless search. *See Chatrie*, 609 U.S. at 630.

## II. ALPRs effect an unreasonable search within the original meaning of the Fourth Amendment.

Although this case is clear under current law, the Court can take a more straightforward route to the same result by returning to the Fourth Amendment's original meaning. In 1791, "search" was not a legal term of art but simply referred to purposeful investigative conduct. The Fourth Amendment's prohibition against unreasonable searches, meanwhile, is best understood as incorporating the Founding-era common law of search and seizure. Searches are unreasonable when, like general warrants, they grant officers unfettered discretion to invade the people's security. ALPRs do precisely that, indiscriminately collecting everyone's movements and making them freely available to officers across the country. Because that would have been an unreasonable search at the Founding, the Court should hold that it is today.

### A. ALPR surveillance is purposeful investigative conduct that would have qualified as a "search" at the Founding.

At the Founding, "search" was not a legal term of art. *See Morgan v. Fairfield County*, 903 F.3d 553, 568 (6th Cir. 2018) (Thapar, J., concurring in part and dissenting in part). Courts should therefore give it the same "normal" meaning it had "to ordinary citizens in the founding generation." *District of Columbia v. Heller*, 554

U.S. 570, 577 (2008). To discern that meaning, the Supreme Court has examined Founding-era dictionaries and texts. *See, e.g.*, *id.* at 581-82.

All those sources converge on the same definition for "search": purposeful investigative conduct. *See generally* John Wrench, *The Original Meaning of "Searches,"* 29 U. Pa. J. Const. L. (forthcoming 2027), https://tinyurl.com/yc23x5hr. Samuel Johnson's dictionary defines a "search" as an "[i]nquiry by looking into every suspected place," "[e]xamination," "[i]nquiry; act of seeking," and "[q]uest; pursuit." 2 Samuel Johnson, *Dictionary of the English Language* (4th ed. 1773), https://tinyurl.com/2v2pba6d; *accord* 2 Noah Webster, *An American Dictionary of the English Language* 66 (1828), https://tinyurl.com/mvke2jsb ("1. A seeking or looking for something that is lost, or the place of which is unknown; with *for* or *after*. … 2. Inquiry; a seeking. … 3. Quest; pursuit for finding."); *see also Kyllo*, 533 U.S. at 32 n.1 (citing Webster). Thus, a "search" is an effort to acquire information or find something—that is, "purposeful, investigative" conduct. *Morgan*, 903 F.3d at 568 (Thapar, J., concurring in part and dissenting in part).

Ordinary citizens at the Founding understood an effort to find a *person* to be a "search." *See, e.g.*, *Kyllo*, 533 U.S. at 32 n.1 ("[T]o *search* the wood for a thief." (citing Webster)). So did officers and jurists. Eighteenth-century justice-of-the-peace manuals had templates for warrants "to search for a lost child." James Parker,

*Conductor Generalis* 461 (1764), https://tinyurl.com/5ypzjy3b.[13] Likewise, an officer could raise a "hue and cry" to "search in his town for suspected persons." *Id.* at 220. By the Founding, that likely would have required a warrant. *See* Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 622 n.198 (1999) (noting "[t]he traditional hue and cry appears to have fallen into disuse" and justice manuals recommended "procur[ing] a hue and cry warrant"); Laura K. Donohue, *The Original Fourth Amendment*, 83 U. Chi. L. Rev. 1181, 1233-35 (2016) (constables were sometimes required to go "to a justice of the peace, and act upon his warrant" before raising hue and cry (citation omitted)). Ordinary people, jurists, and officers in the Founding era therefore viewed attempts to locate people as "searches" that could require a warrant.

Focusing on investigative purpose is consistent with the Founding-era cases that motivated the Fourth Amendment. Although the *cause of action* in these cases was trespass, they identified the core injury as the wrongful acquisition of information. *See, e.g.*, *Entick v. Carrington*, 19 How. St. Tr. 1029, 1066 (CP 1765) ("[T]hough the eye cannot by the laws of England be guilty of a trespass, yet where private papers are removed and carried away, the secret nature of those goods will be an aggravation of the trespass, and demand more considerable damages in that

[13] This was a primary reference for Founding-era justices and constables. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 245 (2022).

respect.”). The earliest Supreme Court case on the issue emphasized the same point. *See Boyd*, 116 U.S. at 630 (“It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property ….”). That makes sense: the Fourth Amendment does not prohibit unreasonable *trespasses* but unreasonable *searches*. Its special protection for papers explains why. For the Framers, “[r]eading the contents of papers was worse than a physical trespass because [it] … enabled searchers to invade the writer’s mind” and discover otherwise hidden information. Morgan Cloud, *Property Is Privacy: Locke and Brandeis in the Twenty-First Century*, 55 Am. Crim. L. Rev. 37, 54-55 (2018). Trespass was the “vehicle[] for judicial remediation” at the Founding, but it makes little sense to conflate Fourth Amendment “searches” with trespasses, especially when Congress has since authorized specific remedies. Richard M. Re, *The Positive Law Floor*, 129 Harv. L. Rev. F. 313, 317 (2016).

The ALPR system at issue here plainly fits this definition of a “search.” Flock’s terms and conditions define “Permitted Purpose” as “a legitimate public safety … purpose, including the awareness, prevention, and prosecution of crime,” as well as “investigations.” *Terms and Conditions*, Flock Safety (last updated Aug. 21, 2026), https://tinyurl.com/52myxzfz. And, indeed, the district court found that police in greater Cleveland use ALPR systems to collect evidence, as they did

here. *Sturdivant*, 786 F. Supp. 3d at 1103-04. This use of technology to track and locate people is purposeful, investigative conduct that would have qualified as a "search" in 1791.

**B. Suspicionless surveillance of every driver using ALPRs is an unreasonable search.**

Just because police conduct is a "search" does not mean it requires a warrant. The Fourth Amendment does not prohibit all searches, just unreasonable ones. Unlike "search," "unreasonable" *was* a legal term of art at the Founding. It was shorthand for "against the reason of the common law." Donohue, *Original Fourth Amendment*, *supra*, at 1270-71; *accord* Davies, *supra*, at 555 n.5, 687-93. Courts had started to develop a robust body of law regulating search and seizure. *See, e.g.*, Tracey Maclin, *Informants and the Fourth Amendment: A Reconsideration*, 74 Wash. U. L.Q. 573, 582-83 (1996). At minimum, this set of rules should set a baseline. *See* Donohue, *Original Fourth Amendment*, *supra*, at 1327 & n.856.

Treating those rules as a ceiling, though, would flout the Framers' intent. To start, the Framers viewed "common law" as a form of reasoning from precedent. *Id.* at 1270-71 & n.513; Davies, *supra*, at 687-93. Beyond that, the common law of their time was not set in stone but instead reflected a rapidly evolving consensus against abusive search practices like general warrants. Maclin, *supra*, at 581-83. There is no reason to believe the Framers intended to end that evolution in 1791, ignoring any troublesome categories of police conduct that materialized in succeeding centuries.

*Cf. United States v. Rahimi*, 602 U.S. 680, 691 (2025) (refusing to leave constitutional amendments "trapped in amber"); *Riley v. California*, 573 U.S. 373, 385-86, 403 (2014) (declining to apply search-incident-to-arrest exception to cellphones).

A common law approach consistent with the Framers' expectations would identify unreasonable searches by asking whether they threaten "[t]he right of the people to be secure." U.S. Const. amend. IV. That requires generalizing from the conduct eighteenth-century common law prohibited, the paradigmatic example being the general search. *See Boyd*, 116 U.S. at 630, 635; *United States v. Rohrig*, 98 F.3d 1506, 1513 (6th Cir. 1996). General warrants were "unreasonable" because they granted unfettered discretion to search without individualized suspicion. *See United States v. U.S. Dist. Ct.*, 407 U.S. 297, 315-16 (1972); Thomas K. Clancy, *The Role of Individualized Suspicion in Assessing the Reasonableness of Searches and Seizures*, 25 U. Mem. L. Rev. 483, 489-90 (1995). Consequently, they "place[d] the liberty of every man in the hands of every petty officer." *Adams' "Abstract of the Argument": Ca. April 1761*, Founders Online, https://tinyurl.com/5d93dhn6 (last visited Nov. 6, 2026). The perceived threat to "every man" explains the Framers'

distinctive specification of both the right ("to be secure") and the "rightholder" ("the people"). Jed Rubenfeld, *The End of Privacy*, 61 Stan. L. Rev. 101, 120 (2008).[14]

Reading all of its words in context, the Fourth Amendment guarantees the *people* at large a right to be *free from constant fear* that they will "appear[] 'suspicious' in the eyes of the state" and be subject to arbitrary invasions on an officer's whim. *Id.* at 127; *see* Luke M. Milligan, *The Forgotten Right to Be Secure*, 65 Hastings L.J. 713, 717-18, 736-37, 743-46 (2014) (arguing that "to be secure" means to be "free from fear" of "the harms attributable to the *potentiality*" of arbitrary invasions). Under this framework, a "search" is "unreasonable" if allowing police to engage in the conduct without judicial oversight would make law-abiding people feel less secure. *Cf.* Rubenfeld, *supra*, at 131 ("[J]udges must ask what the effect would be on the people's right of security if the surveillance … power the government has asserted were to be systematically implemented.").

Although expanding the definition of "search" draws more conduct into the Fourth Amendment's ambit, many of those searches will be "reasonable." Googling a suspect is a warrantless "search," but no one feels less secure knowing officers can run warrantless Google searches, like any private person could. Likewise, a search

---

[14] *See also Almeida-Sanchez v. United States*, 413 U.S. 266, 274 (1973) ("Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart." (citation omitted)); *Entick v. Carrington*, 19 How. St. Tr. at 1074 ("[I]f suspicion at large should be a ground of search … , whose house would be safe?").

incident to a lawful arrest is reasonable because the requirement of a *lawful* arrest means that the search does not make *law-abiding* people less secure. *See* Rubenfeld, *supra*, at 129 ("The Fourth Amendment is not violated by searches and seizures that make criminals insecure."). But letting an officer record anyone's phone call without judicial oversight crosses the line because people would reasonably fear that officers might listen based on a hunch, curiosity, or ill will. *See id.* at 132-33. Knowing that officers must go to a neutral judge, prove probable cause, and get a specific warrant eases that insecurity.

Vast ALPR systems are worse than general warrants because they subject virtually every driver to never-ending suspicionless searches, not just the *potential* for such invasions. *Cf. Berger v. New York*, 388 U.S. 41, 59 (1967) (eavesdrop order was "the equivalent of a series of intrusions, searches, and seizures"). Police then retain the data for weeks or months on the off chance they decide to use those data against the targets later. This surveil-first approach turns the Fourth Amendment upside down: the Fourth Amendment "establishes searches based on evidence—rather than potentially effective, broad, prophylactic dragnets—as the constitutional norm." *Bourgeois v. Peters*, 387 F.3d 1303, 1312 (11th Cir. 2004). And mass ALPR surveillance has undermined the people's security by producing all the abuses the Framers sought to prevent. *See* Donohue, *Original Fourth Amendment*, *supra*, at 1317-20; *cf. Adams' "Abstract of the Argument," supra* (officers could abuse general

warrants out of "revenge, ill humour or wantonness"). The Institute for Justice has collected nearly 300 examples of such abuses, from stalking to tracking critics of the police to wrongful detentions. *See* Christopher Ingraham, *The IJ Database of ALPR Abuse*, Inst. for Just. (Aug. 12, 2026), https://ij.org/the-ij-database-of-alpr-abuse/.

Putting the two pieces together, the use of ALPRs to investigate crime is a "search." And it is an "unreasonable" one because it subjects people to constant, suspicionless surveillance. If the Court applies the Fourth Amendment as originally understood, it should hold that the warrantless use of the ALPR systems violated the Fourth Amendment.

* * *

That *Carpenter*/*Chatrie* and the ordinary meaning test yield the same result is unsurprising. Those cases seek to preserve the "degree of privacy against government that existed when the Fourth Amendment was adopted." *Chatrie*, 609 U.S. at 621 (citation omitted). Founding-era officers had neither the capacity nor authority to conduct mass surveillance, even in public. *See* Wesley MacNeil Oliver, *The Neglected History of Criminal Procedure, 1850-1940*, 62 Rutgers L. Rev. 447, 449-53 (2010). Although night watchmen might have detained suspicious people if they could not account for themselves, *see* Thomas Y. Davies, *The Fictional Character of Law-and-Order Originalism*, 37 Wake Forest L. Rev. 239, 328-29 &

nn.266-68, 345 & nn.333-35 (2002), they did not record *everyone's* movements for later review.

Indeed, Anglo-American common law regarded mass surveillance as tyrannical. *See* 2 Thomas Erskine May, *The Constitutional History of England Since the Accession of George Third, 1760-1860*, at 275 (N.Y., W.J. Widdleton 1874), https://tinyurl.com/bdfsh32p. Thus, the Crown's surveillance of the movements and associations of John Wilkes (an eighteenth-century general-warrant-case plaintiff) was considered "repugnant to the liberal policy of [Anglo-American] law[]" well into the nineteenth century. *Id.* at 276. Yet drivers today routinely suffer the sort of "suspicions and jealous observation" the Framers would have thought "despoti[c]," "baleful," and "absolutis[t]." *Id.* at 275.

## CONCLUSION

The Court should hold that police conducted an unreasonable search when they used ALPR systems to acquire information about Sturdivant's movements without a warrant. That said, the Institute for Justice takes no position on the appropriate remedy (if any) for that Fourth Amendment violation.

Dated: November 9, 2026

Respectfully submitted,

_/s/ Michael B. Soyfer_
Michael B. Soyfer
Robert P. Frommer
Eliana Fleischer
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
Telephone: (703) 682-9320
msoyfer@ij.org
rfrommer@ij.org
efleischer@ij.org

*Counsel for Amicus Curiae the Institute for Justice*

## CERTIFICATE OF COMPLIANCE

This amicus curiae brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,496 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Sixth Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Michael B. Soyfer*
Michael B. Soyfer