**No. 26-3426**

# In the United States Court of Appeals for the Sixth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

LAWRENCE STURDIVANT,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Northern District of Ohio at Cleveland
No. 1:22-cr-00615-1; Hon. J. Philip Calabrese, U.S. District Judge

## BRIEF OF PROJECT FOR PRIVACY & SURVEILLANCE ACCOUNTABILITY, INC. AS *AMICUS CURIAE* SUPPORTING APPELLANT AND REVERSAL

GENE C. SCHAERR
JUSTIN A. MILLER
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Amicus Curiae*

NOVEMBER 9, 2026

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 26-3426 Case Name: United States of America v. Sturdivant

Name of counsel: Gene C. Schaerr

Pursuant to 6th Cir. R. 26.1, Project for Privacy & Surveillance Accountability, Inc.
*Name of Party*
makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No

CERTIFICATE OF SERVICE

I certify that on November 9, 2026 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Gene C. Schaerr
Gene C. Schaerr
Counsel for Amicus Curiae

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

**TABLE OF CONTENTS**

DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... iii

INTRODUCTION, IDENTITY AND INTEREST OF *AMICUS CURIAE*, AND SOURCE OF AUTHORITY TO FILE .......... 1

SUMMARY OF ARGUMENT .......... 3

ARGUMENT .......... 7

I. After *Chatrie*, the Search Inquiry Cannot Be Reduced to How Much Information a Particular Query Returned. .......... 7

A. The quantity of information returned by an ALPR query cannot resolve whether a search occurred. .......... 8

B. The qualitative characteristics of a surveillance mechanism inform whether retrospective access was a search. .......... 10

II. Retrospective ALPR Querying Implicates the Qualitative Concerns that Distinguish *Carpenter* from Public Exposure and Plain View Cases. .......... 12

A. Cuyahoga County's system automatically collected geolocated plate information before individualized suspicion arose and retained it in a searchable archive. .......... 13

B. Historical querying allowed officers, *after* identifying a target, to aggregate and retrieve the vehicle's previously recorded locations. .......... 16

C. The Fourth Amendment inquiry should focus on the character of the surveillance mechanism, not require a complete reconstruction of a person's movements. .......... 19

CONCLUSION .......... 21

CERTIFICATE OF COMPLIANCE .......... 23

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Carpenter v. United States*,
585 U.S. 296 (2018) ..................... 1, 3, 8, 9, 10, 11, 12, 13, 14, 15, 18, 19

*Chatrie v. United States*,
609 U.S. 605 (2026) ..................... 1, 3, 7, 8, 9

*Katz v. United States*,
389 U.S. 347 (1967) ..................... 9

*Kyllo v. United States*,
533 U.S. 27 (2001) ..................... 8, 9

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
2 F.4th 330 (4th Cir. 2021) ..................... 6, 18, 19

*New York v. Class*,
475 U.S. 106 (1986) ..................... 17

*Schmidt v. City of Norfolk*,
819 F. Supp. 3d 492 (E.D. Va. 2026) ..................... 20

*United States v. Ellison*,
462 F.3d 557 (6th Cir. 2006) ..................... 8, 17

*United States v. Hasbajrami*,
945 F.3d 641 (2d Cir. 2019) ..................... 18

*United States v. Jones*,
565 U.S. 400 (2012) ..................... 19

*United States v. Knotts*,
460 U.S. 276 (1983) ..................... 4, 6, 10, 11, 14, 15, 16, 17

*United States v. Porter*,
170 F.4th 381 (5th Cir. 2026) ..................... 20

*United States v. Rubin*,
556 F. Supp. 3d 1123 (N.D. Cal. 2021) ..................... 20

**Rules**

Fed. R. App. P. 29(a)(2) ..................... 1

## INTRODUCTION, IDENTITY AND INTEREST OF *AMICUS CURIAE*, AND SOURCE OF AUTHORITY TO FILE[1]

The Fourth Amendment does not measure a search by how much the government happens to come away with. Yet the district court's analysis turned on just that comparison. The court denied Sturdivant's motion to suppress on two grounds. First, a driver has no reasonable expectation of privacy in his vehicle's license plate and exterior characteristics. Opinion & Order, R.103, PageID ##1956–1957. And second, the automated-license-plate-reader (ALPR) databases at issue are "less intrusive" than the cell-site location information in *Carpenter v. United States*, 585 U.S. 296 (2018). Opinion & Order, R.103, PageID ##1964–1965. The court therefore concluded that querying the historical ALPR records was not a search. Opinion & Order, R.103, PageID #1962. But after *Chatrie v. United States*, 609 U.S. 605 (2026), the limited information returned by a particular government query of location

[1] All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund the preparation or submission of the brief; and no person other than *amicus*, its members, or its counsel contributed money that was intended to fund the brief's preparation or submission.

records cannot substitute for examining whether that query was a search.

Instead, rather than focusing on how much data a given query yields, courts must now examine what the government did and how the surveillance system worked. And here, officers queried a database that automatically collected location records before individualized suspicion arose, retained and aggregated those records, and allowed investigators to retrieve a vehicle's historical locations after identifying it as a target. After *Chatrie*, at least the final step is a search.

This determination is critical to *amicus* Project for Privacy and Surveillance Accountability, Inc. ("PPSA"), a nonprofit, nonpartisan organization dedicated to protecting privacy rights against government overreach. The warrantless retention and retrospective querying of location databases, including ALPR systems, is central to that mission. Such systems let the government reconstruct where a person has been from records automatically gathered long before any individualized suspicion. PPSA submits this brief to explain the framework that should govern retrospective access to a retained location database after *Chatrie*,

and why the amount of information a single query returns cannot substitute for that analysis.

## SUMMARY OF ARGUMENT

The district court erroneously denied suppression on two grounds: First, a driver has no reasonable expectation of privacy in his vehicle's license plate and exterior characteristics. Opinion & Order, R.103, PageID ##1956–1957. And second, the automated-license-plate-reader (ALPR) databases at issue are "less intrusive" than the cell-site location information in *Carpenter v. United States*, 585 U.S. 296 (2018). Opinion & Order, R.103, PageID ##1964–1965. Neither ground can be squared with the intervening *Chatrie* decision.

I. *Chatrie* clarified that (1) where the Fourth Amendment applies, coverage attaches "regardless of 'the quality or quantity of information'" the government obtains, and (2) whether conduct is a search "does not depend on what it finds." *Chatrie v. United States*, 609 U.S. 605, 629, 632 (2026) (citation omitted). The search inquiry therefore cannot turn on the number of records a particular query happens to return.

Yet here, the district court focused on the quantity and completeness of the information a particular query returned—here, the

"26 photographs" of Sturdivant's car. Opinion & Order, R.103, PageID ##1967–1968. But under *Chatrie*, that count describes only what investigators obtained, not the constitutional character of their access. That analysis requires two considerations. First is the nature of the challenged governmental conduct—retrospective interrogation of historical location information automatically accumulated before investigators decide to query a plate. Second is the characteristics of the surveillance mechanism that makes that query possible. Those characteristics include automatic collection, aggregation, retention, retrospective searchability, and the ability to reveal historical location information.

Under both lines of analysis, retrospective ALPR querying implicates the qualitative characteristics that distinguish *Carpenter* from plain view or public exposure cases like *United States v. Knotts*, 460 U.S. 276 (1983). *Carpenter* looked past the number of data points obtained to the character of the surveillance at issue. And several of the characteristics that concerned the Court in *Carpenter* are present here. The Flock and ELSAG systems involved in the investigation automatically capture photos of and information about vehicles that pass.

Opinion & Order, R.103, PageID ##1945–1947. That collection includes characteristics such as color, body type, make and model, damage, and temporary tags. Opinion & Order, R.103, PageID ##1946–1947. And it occurs before any target emerges.

Between the two ALPR systems, Cuyahoga County has "approximately 1,800 to 3,000 cameras" available to law enforcement. Opinion & Order, R.103, PageID #1963. Flock retains images for thirty days and ELSAG retains images for one year. Opinion & Order, R.103, PageID ##1946–1947. These systems allow law enforcement officers to search a car by various characteristics, not just by license plate. Opinion & Order, R.103, PageID ##1946–1947. Officers may then retrieve the vehicle's previously recorded locations. Opinion & Order, R.103, PageID ##1946–1947. And this is all done without a warrant. The government used that capability here to query the black Camaro's plate and retrieve its locations from November and December. Opinion & Order, R.103, PageID ##1951–1952.

II. By contrast, the procedure approved in *Knotts* was a real-time, beeper-aided observation of a single journey on public roads. And the Court there expressly reserved the question of mass or dragnet

surveillance. *Knotts*, 460 U.S. at 283–84. Here, Cuyahoga County's ALPR system works in reverse. Officers can identify a vehicle after an investigation begins and *then* retrieve location records accumulated before anyone followed it. The Fourth Circuit treated that access as a constitutional event even where the government itself collected the data. *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 347 (4th Cir. 2021) (en banc).

The constitutional analysis therefore should not turn on whether this query happened to reconstruct a sufficiently complete account of Sturdivant's movements. Instead, it concerns retrospective interrogation of an automatically generated and retained historical-location archive, not ordinary visual observation, contemporaneous plate checks, real-time alerts, or routine government record checks.

Because the district court's Fourth Amendment analysis cannot survive *Chatrie*, the Court should hold that the output of a particular query cannot substitute for analysis of the surveillance mechanism. It should also hold that the retrospective ALPR query here was a search. Or, if further fact-finding is needed, it should vacate the denial of

suppression and remand for application of the correct Fourth Amendment framework.

## ARGUMENT

The district court erred on two related questions. First, the district court treated the limited results of an ALPR query as a reason to deny Fourth Amendment protection. Section I explains why *Chatrie* forecloses that approach. Second, the court failed to account for the retrospective surveillance that Cuyahoga County's system enabled. Section II shows why that capability implicates the concerns identified in *Carpenter*.

### I. After *Chatrie*, the Search Inquiry Cannot Be Reduced to How Much Information a Particular Query Returned.

The district court resolved the search question by comparing the ALPR information obtained here with the cell-site data in *Carpenter*. But that comparison overlooked a critical distinction in *Chatrie*. The amount of information obtained does not determine the constitutional protection for information in which a person has a reasonable expectation of privacy. To the contrary, "[w]here the Fourth Amendment applies, it applies—regardless of the quality or quantity of information the government obtains." *Chatrie*, 609 U.S. at 629 (quoting *Kyllo v. United States*, 533

U.S. 27, 37 (2001)). The district court therefore had to examine the character of the government's access, not merely its results.

### A. The quantity of information returned by an ALPR query cannot resolve whether a search occurred.

In its June 2026 order denying Sturdivant's motion to suppress, the district court first quoted the Sixth Circuit's holding that there is "no reasonable expectation of privacy in the information contained on [a] license plate." Opinion & Order, R.103, PageID #1954 (quoting *United States v. Ellison*, 462 F.3d 557, 561 (6th Cir. 2006)). It then distinguished ALPR data from the cell phone location data in *Carpenter* because it is "less intrusive" and "could not create 'an all-encompassing record' of Mr. Sturdivant's whereabouts." Opinion & Order, R.103, PageID #1964 (quoting *Carpenter*, 585 U.S. at 311–12).

The district court erred in treating the less comprehensive ALPR information as a principal reason the surveillance resembled plain-view cases like *Ellison*, not *Carpenter*. After *Chatrie*, the output of a particular query cannot carry that threshold judgment. There, the Supreme Court held that "[w]here the Fourth Amendment applies, it applies—regardless of the quality or quantity of information the government obtains." 609 U.S. at 629 (quoting *Kyllo*, 533 U.S. at 37). Whether a method yields ten

records or ten thousand, the number alone cannot establish whether the government's conduct implicates a protected Fourth Amendment interest. A search of limited yield is still a search, whether it yields two hours of geolocation data, *id.* at 637–39; eighteen minutes of phone recordings, *Katz v. United States*, 389 U.S. 347, 354 n.14 (1967); or one thermal imaging scan of a home, *Kyllo*, 533 U.S. at 30. The Fourth Amendment makes "no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor." *Kyllo*, 533 U.S. at 37. Whether conduct is a search, *Chatrie* confirmed, "does not depend on what it finds." 609 U.S. at 632.

The Court also rejected the related move of discounting an intrusion because the government drew only a limited set of records "from an all-encompassing database." *Id.* at 629–30. The "sweep of the official invasion is not made less" by that hindsight selection. *Id.* at 630.

The district court's reliance on public exposure does not independently resolve the question. A person "does not surrender all Fourth Amendment protection by venturing into the public sphere." *Carpenter*, 585 U.S. at 310. And *Carpenter* confined *United States v.*

*Knotts*, 460 U.S. 276, 281 (1983), a public exposure tracking case, to its facts—short-range tracking of a "discrete" journey on public roads. *Carpenter*, 585 U.S. at 306. Neither public exposure nor the limited results of this query relieve the court of examining the retrospective surveillance that produced those results.

### B. The qualitative characteristics of a surveillance mechanism inform whether retrospective access was a search.

In *Carpenter*, the Supreme Court identified qualitative characteristics of modern location surveillance that set historical cell-site records apart from public exposure and observation. First, the surveillance was automatic rather than effortful, generating a record "without any affirmative act on the part of the user beyond powering up." *Carpenter*, 585 U.S. at 315. Second, it was retrospective, giving police access to "a category of information otherwise unknowable" and the power to "travel back in time to retrace a person's whereabouts." *Id.* at 312. Third, the retained records were both effortless to retrieve and "remarkably easy, cheap, and efficient compared to traditional investigative tools." *Id.* at 311. And fourth, its reach was broad and continuous. *Id.* at 311–12. Those characteristics together explained why

accessing the records implicated a reasonable expectation of privacy. The scope of the surveillance mattered, but the Court did not establish a numerical threshold applicable to every form of location tracking.

The district court found that Cuyahoga County's system shared many of these defining characteristics. It found that the ALPR database operates "retrospectively," Opinion & Order, R.103, PageID #1966, and "officers 'can . . . travel back in time to retrace a [vehicle's] whereabouts, subject only to the retention policies' of private companies like Flock." Opinion & Order, R.103, PageID #1966 (quoting *Carpenter*, 585 U.S. at 312). It also found that ALPR data can record a vehicle's "precise location at a specific time" and, because each data point is a photograph, provides "richer visual information" about the vehicle and its surroundings. Opinion & Order, R.103, PageID #1966. And it even found that ALPR data might be even more "granular" than *Carpenter*'s cell-site records. Opinion & Order, R.103, PageID #1965. Yet the district court ruled that such a system was not the "dragnet type law enforcement practice[]" that is a Fourth Amendment search. Opinion & Order, R.103, PageID #1967 (citing *Knotts*, 460 U.S. at 284).

Rather than focus on these characteristics, the district court focused on the amount of information Cuyahoga County's system collected. It emphasized the system's limited coverage and the resulting records, then concluded that the query was not a search because the database was less intrusive than the data in *Carpenter*.

But the correct inquiry is qualitative. It asks what kind of governmental conduct the ALPR mechanism enables and what characteristics that mechanism shares with the surveillance *Carpenter* addressed. Because the district court did not make that inquiry, this Court should hold that the retrospective query was a search. Or, if further fact-finding is needed, the Court should vacate and remand for application of the correct *Carpenter* and *Chatrie* framework.

## II. Retrospective ALPR Querying Implicates the Qualitative Concerns that Distinguish *Carpenter* from Public Exposure and Plain View Cases.

Cuyahoga County's ALPR system presents the kind of retrospective surveillance that public exposure and plain view cases do not address. *Carpenter* distinguished *Knotts*'s "rudimentary" tracking of a single journey from "more sweeping modes of surveillance." 585 U.S. at 306. And Cuyahoga County's system shares several characteristics of the

surveillance examined in *Carpenter*. See *id.* at 309–12. Data collects automatically, rather than through effortful observation. And it collects before any investigative interest arises. It is then retained and aggregated into a searchable, government-held archive. And the government may retrieve it retrospectively, cheaply, and at will, to learn where a vehicle was during a period no officer followed it.

### A. Cuyahoga County's system automatically collected geolocated plate information before individualized suspicion arose and retained it in a searchable archive.

1. In contrast to the technology in *Knotts*, the Cuyahoga County ALPR system automatically collects location data. In 2021, law enforcement there had access to up to 3,000 cameras. Opinion & Order, R.103, PageID #1963. Each camera designed to capture the license plate and other identifying characteristics of cars that enter its field of view. Opinion & Order, R.103, PageID ##1946–1947. The cameras run "24/7/365" and send their data to a central database accessible by law enforcement. Cuyahoga County Emerg. Servs. Adv. Bd. Investment/Project Request, R.93-2, PageID #1537; Opinion & Order, R.103, PageID ##1947–1952. Each read is geolocated by the camera's GPS and bears a time stamp. ELSAG Camero Scans, R.93-17, PageID

##1648–1677. And the data collects without consent from the drivers or owners of the photographed vehicles. That "automatic nature" of data collection separates the surveillance system in *Carpenter*, 585 U.S. at 311–12, 320, from the beeper in *Knotts*. The beeper merely emitted a signal that augmented an officer's live pursuit, 460 U.S. at 278.

Because collection is automatic, Cuyahoga County records a vehicle's location before officers develop any investigative interest in it. So here, the historical reads about the black Camaro's location automatically accumulated three weeks before investigators queried its plate. Nathan Schwartz Aff., R.1-1 ¶¶ 8–9, 42, PageID ##5–6, 16–17. Those records were not collected in response to any investigative interest in the vehicle.

That practice let the government assemble a record of the past "without any affirmative act on the part of the user beyond powering up." *Carpenter*, 585 U.S. at 311. The *Knotts* beeper, by contrast, revealed nothing until installed and revealed nothing about the period before.

2. Cuyahoga County also retained those automatically collected records for later use. Flock keeps those records for ninety days and ELSAG for one year. Opinion & Order, R.103, PageID ##1946–1947.

Those records are uploaded to a server, searchable "by license plate number," Opinion & Order, R.103, PageID ##1946–1947, so that future queries may return a plate's accumulated history. By contrast, the beeper in *Knotts* created no archive; it transmitted a real-time signal and nothing more. 460 U.S. at 278.

Cuyahoga County's archive also let *federal* officers retrieve the black Camaro's historical locations without having followed it. ATF agents ran "80 to 90 Flock searches," Opinion & Order, R.103, PageID #1964, and obtained the vehicle's stored history—exactly the "remarkably easy, cheap, and efficient" access *Carpenter* flagged. 585 U.S. at 311, But here the data is collected by the government, not a cell phone company. *Id.* The *Knotts* beeper was different in kind; officers still had to follow the car in real time. 460 U.S. at 277–78.

In short, the ALPR surveillance technology at issue here bears little resemblance to *Knotts*, other than involving a car. The Cuyahoga County ALPR system involves the automatic collection, retention, and aggregation of retrospectively searchable location information that *Carpenter* flagged. Accordingly, the district court erred in asserting that

"no reasonable expectation of privacy" exists for drivers subject to its cameras.

### B. Historical querying allowed officers, *after* identifying a target, to aggregate and retrieve the vehicle's previously recorded locations.

Cuyahoga County's ALPR system also enables the retrospective retrieval of location history, cheaply and at will. It does not merely "augment[]" the contemporaneous observations police would already make of a vehicle on public roads. *Knotts*, 460 U.S. at 282.

1. Retrospective retrieval means that any officer can query a license plate and receive its aggregated history: a record of the plate's captured encounters with the system, including their locations and times. Opinion & Order, R.103, PageID ##1946–1947. And that ability exists not just for the eventual suspect. Records of other vehicles captured by the system likewise remain available for later queries.

Here, a federal agent queried the black Camaro's plate and retrieved 26 reads showing the vehicle parked in the same area. Opinion & Order, R.103, PageID #1947. And the query gave officers access to a past they had not observed. An officer conducting visual surveillance cannot go back in time to watch a vehicle for a month when no one chose

to follow it. But querying a searchable ALPR database lets him do exactly that. The proper comparison then is not to a lone officer following a beeper like in *Knotts*, but to an integrated mechanism like the one in *Carpenter*. Unlike the lone officer, the mechanism at issue makes backward-looking queries possible—automatic fleet collection, geolocation, retention, aggregation, and retrieval on demand.

The district court missed this distinction. Its analysis followed the premise that a car, unlike a cell phone, "has little capacity for escaping public scrutiny," Opinion & Order, R.103, PageID ##1954–1955 (quoting *New York v. Class*, 475 U.S. 106, 112–13 (1986)), and that travel on public roads carries no reasonable expectation of privacy, Opinion & Order, R.103, PageID ##1956–1957 (citing *Ellison*, 462 F.3d at 561). But even *Knotts*—a case involving real-time tracking on public roads—reserved the different question presented by "dragnet type law enforcement practices," warning that "if such . . . practices . . . should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable." 460 U.S. at 281–84.

*Carpenter* answered part of that reserved question, holding that aggregated, retrospective location surveillance can invade a reasonable

expectation of privacy even in public movement. That is because "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement" of a person over an extended period. 585 U.S. at 310 (citation omitted). The district court's categorical treatment of a vehicle as beyond Fourth Amendment concern thus overreads *Knotts* and underreads *Carpenter*.

2. Nor does it matter that Cuyahoga County collected and possessed the records itself. As the Second Circuit explained in *United States v. Hasbajrami*, "lawful collection alone is not always enough to justify a future search." 945 F.3d 641, 670 (2d Cir. 2019). Though not every query of government-held records is a search, *Hasbajrami* confirms that lawful collection does not resolve whether the government conducts a search when it later queries those records. *See Leaders of a Beautiful Struggle*, 2 F.4th at 347. And whether that retrospective access is a search cannot depend solely on how completely the stored records reconstruct a vehicle's movements.

### C. **The Fourth Amendment inquiry should focus on the character of the surveillance mechanism, not require a complete reconstruction of a person's movements.**

Nor does the Fourth Amendment require a surveillance system to reconstruct every movement before its retrospective use can be a search.

1. *Carpenter*'s reference to the "whole of [a person's] physical movements" described the effect of comprehensive cell-site records. 585 U.S. at 310–11. It did not set a threshold that every surveillance technology must meet before the Fourth Amendment applies. *See id.* The Fourth Circuit likewise recognized that gaps in a surveillance record do not necessarily defeat Fourth Amendment protection: The datasets in *United States v. Jones*, 565 U.S. 400 (2012), and *Carpenter* "had gaps . . . too." *Leaders of a Beautiful Struggle*, 2 F.4th at 341–42.

So too here. Cuyahoga County's system was not comprehensive. But any coverage limitations do not eliminate the system's capacity to collect, retain, and retrospectively retrieve historical location records. The Fourth Amendment inquiry must account for that capability, even when the resulting record contains gaps.

2. Other courts have still treated limited ALPR coverage as a substantial reason to distinguish *Carpenter*. *See, e.g.*, *United States v.*

*Rubin*, 556 F. Supp. 3d 1123, 1127–29 (N.D. Cal. 2021); *United States v. Porter*, 170 F.4th 381, 387 (5th Cir. 2026); *Schmidt v. City of Norfolk*, 819 F. Supp. 3d 492, 511 (E.D. Va. 2026). But each of these decisions predates *Chatrie*. And none considered its intervening instruction that the scope of a protected Fourth Amendment interest cannot be determined merely by the quantity of information ultimately obtained. To be sure, the extent of a surveillance system's coverage remains relevant. But in no event can the limited records returned by a particular query substitute for examining the nature of the government's access and the mechanism that made it possible.

The relevant constitutional question therefore concerns retrospective access to an archive that automatically collects, aggregates, and retains historical location records before investigators identified a target. It does not reach an officer's visual observation of a publicly displayed plate, a contemporaneous plate check, or a real-time ALPR alert. Nor does it treat every government database as constitutionally protected. The relevant distinction is between observing a vehicle as it travels and interrogating an accumulated record of where it traveled before investigators chose to follow it.

This Court should hold that the retrospective query was a search. At a minimum, the Court should vacate and remand so the district court can assess the nature of the challenged conduct and the characteristics of the mechanism that enabled it. That would include such issues as the manner of collection and its coverage, retention, aggregation, and retrospective searchability. It would not include whether the system could reconstruct the whole, or some set fraction, of a person's movements.

## CONCLUSION

The district court's focus on the limited scope of Cuyahoga County's ALPR records disregarded the constitutional significance of retrospective access to an automatically collected and retained location archive. Under *Carpenter* and *Chatrie*, the Fourth Amendment inquiry cannot turn on the quantity of information a particular query returns. Consistent with these principles, the Court should hold that the retrospective query here was a search. But if further findings are needed, the Court should vacate the suppression ruling and remand for application of the correct Fourth Amendment framework.

November 9, 2026

Respectfully submitted,

*/s/Gene C. Schaerr*

GENE C. SCHAERR
JUSTIN A. MILLER
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5) of the Federal Rules of Appellate Procedure because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Sixth Circuit Rule 32(b), this document contains 3,947 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Century Schoolbook, 14-point font, in Microsoft Word 365.

Dated: November 9, 2026

*/s/ Gene C. Schaerr*
Gene C. Schaerr